[820 NE2d 840, 787 NYS2d 196]

SHARWLINE NICHOLSON, on Behalf of Herself, Her Infant Children, DESTINEE B. and Another, and All Others Similarly Situated, et al., Respondents, v NICHOLAS SCOPPETTA, Individually and as Commissioner of Administration for Children's Services, et al., Appellants, et al., Defendants.

Argued September 7, 2004; decided October 26, 2004

358

**POINTS OF COUNSEL**

*Michael A. Cardozo, Corporation Counsel,* New York City (*Alan G. Krams, Leonard Koerner, Jonathan Pines, Martha A. Calhoun, Carolyn Wolpert* and *Kristin M. Helmers* of counsel), for appellants. I. A child can be neglected within the meaning of section 1012 (f) (i) (B) of the Family Court Act when a parent who is a victim of domestic violence fails to take appropriate steps to protect her child from actual harm, or the risk thereof, resulting from witnessing the violence. (*Matter of Nicole V.,* 71 NY2d 112; *Matter of Tompkins County Support Collection Unit v Chamberlin,* 99 NY2d 328; *Matter of Jessica YY.,* 258 AD2d

743; *People v Carroll,* 93 NY2d 564; *Matter of Peterson Children,* 185 Misc 2d 351; *Matter of Daphne G.,* 308 AD2d 132; *People v Johnson,* 95 NY2d 368; *People v Malone,* 180 Misc 2d 744; *People v Hitchcock,* 98 NY2d 586; *People v Parr,* 155 AD2d 945.) II. In some cases, the risks of emotional injury arising from witnessing domestic violence can constitute imminent danger to life and health warranting removal. (*Matter of Commissioner of Social Servs. [R./S. Children],* 168 Misc 2d 11; *Matter of Robert H.,* 307 AD2d 293; *Tenenbaum v Williams,* 193 F3d 581; *Matter of Christopher JJ.,* 281 AD2d 720; *Matter of Erika B.,* 268 AD2d 586; *Matter of Maria M.,* 244 AD2d 255; *Matter of Kasheena M.,* 245 AD2d 231.) III. The decision to remove or place a child because of witnessing domestic violence is based on an assessment of case-specific facts, not on a presumption that removal is necessary. (*Friederwitzer v Friederwitzer,* 55 NY2d 89; *Matter of Philip M.,* 82 NY2d 238; *Matter of Tami G.,* 209 AD2d 869, 85 NY2d 804; *Matter of Athena M.,* 253 AD2d 669; *Matter of Lonell J.,* 242 AD2d 58; *Matter of Deandre T.,* 253 AD2d 497; *Matter of Eric B.,* 299 AD2d 754; *Matter of Carlos M.,* 293 AD2d 617; *Matter of Marino S.,* 100 NY2d 361; *Matter of Marie B.,* 62 NY2d 352; *Matter of Bennett v Jeffreys,* 40 NY2d 543.)

*Lansner & Kubitschek,* New York City (*David J. Lansner* and *Carolyn A. Kubitschek* of counsel), and *Sanctuary for Families, Center for Battered Women's Legal Services (Jill M. Zuccardy* of counsel), for Subclass A respondents. I. A battered mother has not neglected her child where the sole allegation is that her child witnessed domestic violence against her. (*Matter of Scott M.,* 284 AD2d 589; *Matter of Jessica R.,* 230 AD2d 108; *People v Johnson,* 95 NY2d 368; *People v Jenkins,* 282 AD2d 926; *People v Alexander,* 97 NY2d 482; *Matter of H./R. Children,* 302 AD2d 288; *Matter of E.R. v G.S.R.,* 170 Misc 2d 659; *Wissink v Wissink,* 301 AD2d 36; *Samala v Samala,* 309 AD2d 798; *Matter of Finkbeiner v Finkbeiner,* 270 AD2d 417.) II. Possible future emotional harm to a child who has witnessed domestic violence does not justify removal from the victim parent. (*Matter of Dominique A.,* 307 AD2d 888; *Moodian v County of Alameda Social Servs. Agency,* 206 F Supp 2d 1030; *Tenenbaum v Williams,* 193 F3d 581, *cert denied sub nom. City of New York v Tenenbaum,* 529 US 1098; *Matter of Marie B.,* 62 NY2d 352; *Matter of Ronald FF. v Cindy GG.,* 70 NY2d 141; *Matter of Spence-Chapin Adoption Serv. v Polk,* 29 NY2d 196; *Matter of Tammie Z.,* 66 NY2d 1; *Matter of Ella B.,* 30 NY2d 352; *Matter of Karen L.,* 80 AD2d 681; *Matter of Roy Anthony A.,* 59 AD2d 662.) III. The City of New York must offer particularized evidence to justify

removal of a child, including proof that the harm of remaining in the home exceeds the harm of removal. (*Matter of John B. v Niagara County Dept. of Social Servs.*, 289 AD2d 1090; *Matter of Kimberly H.*, 242 AD2d 35; *Matter of Robert H.*, 307 AD2d 293; *Matter of Tantalyn TT.*, 115 AD2d 799; *Matter of Tammie Z.*, 66 NY2d 1; *Matter of Ella B.*, 30 NY2d 352; *Matter of Hofbauer*, 47 NY2d 648; *Matter of Ronald FF. v Cindy GG.*, 70 NY2d 141; *Matter of Bennett v Jeffreys*, 40 NY2d 543; *Matter of Spence-Chapin Adoption Serv. v Polk*, 29 NY2d 196.)

*Legal Aid Society, Juvenile Rights Division*, New York City (*Judith Waksberg* and *Monica Drinane* of counsel), and *Lawyers For Children, Inc.* (*Karen Freedman* of counsel), for Subclass B respondents. I. The definition of a "neglected child" under Family Court Act § 1012 (f) and (h) does not include instances in which the sole allegation of neglect is that the parent or other person legally responsible for the child's care allows the child to witness domestic abuse against the caretaker. (*Matter of Jason T.*, 2 AD3d 738; *Matter of Theresa CC.*, 178 AD2d 687; *Matter of Lonell J.*, 242 AD2d 58; *Matter of Nassau County Dept. of Social Servs. [Dante M.] v Denise J.*, 87 NY2d 73; *Matter of Jeremiah M.*, 290 AD2d 450; *Matter of Tami G.*, 209 AD2d 869; *People v Johnson*, 95 NY2d 368; *Matter of Michael G.*, 300 AD2d 1144; *Matter of Francis S.*, 296 AD2d 507; *Matter of Athena M.*, 253 AD2d 669.) II. The injury or possible injury, if any, that results to a child who has witnessed domestic abuse against a parent or other caretaker cannot constitute "danger" or "risk" to the child's "life or health," as those terms are defined in Family Court Act §§ 1022, 1024, 1026 and 1028. (*Kia P. v McIntyre*, 235 F3d 749; *Tenenbaum v Williams*, 193 F3d 581; *Gottlieb v County of Orange*, 84 F3d 511; *Hurlman v Rice*, 927 F2d 74; *Good v Dauphin County Social Servs. for Children & Youth*, 891 F2d 1087; *Duchesne v Sugarman*, 566 F2d 817; *Matter of Robert H.*, 307 AD2d 293; *Matter of Maria M.*, 244 AD2d 255; *Franz v Lytle*, 997 F2d 784; *Matter of Kimberly H.*, 242 AD2d 35.) III. The fact that the child witnessed such abuse does not suffice to demonstrate that "removal is necessary" under Family Court Act §§ 1022, 1024 and 1027, or that "removal was in the child's best interests" under Family Court Act §§ 1028 and 1052 (b) (i) (A), without the child protective agency offering additional particularized evidence to justify removal. (*Matter of Nicole V.*, 71 NY2d 112; *Matter of Nassau County Dept. of Social Servs. [Dante M.] v Denise J.*, 87 NY2d 73; *Matter of Philip M.*, 82 NY2d 238; *Matter of Marie B.*, 62 NY2d 352; *Matter of Cruz*, 121 AD2d 901; *Matter of Isaiah Keith B.*, 306 AD2d 343; *Matter*

*of Ronald M.,* 254 AD2d 838; *Matter of Daniella HH.,* 236 AD2d 715; *Matter of William T.,* 185 AD2d 413; *Matter of Synovia G.,* 163 AD2d 257.)

*Greenberg Traurig LLP,* New York City (*Alan Mansfield, Stephen L. Saxl, Hilary Ames* and *Jae J. Kim* of counsel), for National Coalition Against Domestic Violence and others, amici curiae. I. An interpretation of article 10 of the Family Court Act that would permit removal or neglect proceedings based solely on the fact that the custodial parent has been the victim of domestic violence would violate substantive due process. (*Troxel v Granville,* 530 US 57; *Washington v Glucksberg,* 521 US 702; *Tenenbaum v Williams,* 193 F3d 581; *Lehr v Robertson,* 463 US 248; *Meyer v Nebraska,* 262 US 390; *Duchesne v Sugarman,* 566 F2d 817; *Parham v J.R.,* 442 US 584; *Pierce v Society of Sisters of Holy Names of Jesus & Mary,* 268 US 510; *Matter of Bennett v Jeffreys,* 40 NY2d 543; *Moore v City of E. Cleveland, Ohio,* 431 US 494.) II. An interpretation of article 10 of the Family Court Act that would permit ex parte removal without a hearing or court ordered removal or neglect proceedings based solely on the fact that the custodial parent has been the victim of domestic violence would violate the procedural due process rights of plaintiff classes. (*Matter of Deanna E.,* 150 Misc 2d 1074; *Stanley v Illinois,* 405 US 645; *Wallis v Spencer,* 202 F3d 1126; *Mathews v Eldridge,* 424 US 319; *Tenenbaum v Williams,* 193 F3d 581; *Batten v Gomez,* 324 F3d 288; *Armstrong v Manzo,* 380 US 545; *Jordan by Jordan v Jackson,* 15 F3d 333; *Dykes v Hosemann,* 743 F2d 1488; *Matter of Adrian J.,* 119 Misc 2d 900.)

*Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.,* Washington, D.C. (*Michael C. Bisignano* of counsel), for National Network to End Domestic Violence, Inc., and others, amici curiae. I. Labeling a child who witnesses abuse "neglected" is wrong as a matter of law and policy. (*Planned Parenthood of Southeastern Pa. v Casey,* 505 US 833; *United States v Morrison,* 529 US 598.) II. The dangers and risks attendant to a child witnessing domestic violence must be balanced with dangers and risks of removal. III. New York law should require a particularized showing of harm.

*Suzanne E. Tomkins,* Buffalo, for New York State Coalition Against Domestic Violence and others, amici curiae. I. The findings in *Nicholson v Williams* (203 F Supp 2d 153 [2002]) are consistent with the model policies for child welfare cases involving domestic violence adopted by the State of New York. (*Thur-*

*man v City of Torrington,* 595 F Supp 1521; *Matter of Lonell J.,* 242 AD2d 58; *Matter of Griselua A.,* 304 AD2d 659; *Matter of Carlos M.,* 293 AD2d 617; *Matter of Francis S.,* 296 AD2d 507; *Matter of James MM. v June OO.,* 294 AD2d 630; *Matter of Michael G.,* 300 AD2d 1144; *Matter of Athena M.,* 253 AD2d 669.) II. This Court should reject any per se standards in child welfare cases involving domestic violence. (*Matter of Billy Jean II.,* 226 AD2d 767; *Matter of Tammie Z.,* 105 AD2d 463; *Matter of Tami G.,* 209 AD2d 869; *Matter of Nichole SS.,* 296 AD2d 618; *Matter of Jasmine R.,* 258 AD2d 361; *Matter of Kenny C.,* 245 AD2d 32.) III. Abused mothers and their children can remain together safely. IV. The most effective way to achieve safety for children is to pursue safety for mothers who are abused and to hold offenders accountable.

*Arent Fox PLLC,* Washington, D.C. (*Evan Stolove, Janine Carlan, Jennifer Myron* and *Marcy L. Karin* of counsel), for Pennsylvania Coalition Against Domestic Violence and others, amici curiae. I. Witnessing domestic violence does not constitute "neglect" by the battered mother. (*Matter of Lonell J.,* 242 AD2d 58; *Matter of Barber v Stanley,* 260 AD2d 744; *Matter of Bryan L.,* 149 Misc 2d 899; *Matter of Megan G.,* 291 AD2d 636; *People v Koertge,* 182 Misc 2d 183.) II. Forced separation of children from their nonabusive, protective mothers is not in their best interests. (*Matter of Loraida G.,* 183 Misc 2d 126; *Marisol A. by Forbes v Giuliani,* 929 F Supp 662.) III. The plain language and the legislative history of the Family Court Act do not permit the State of New York to remove children from their mothers because of witnessing domestic violence. IV. It is the *system*—not mothers—that is failing to protect children.

*Deborah A. Widiss,* New York City, *Christina Brandt-Young* and *Jennifer K. Brown* for Legal Momentum and others, amici curiae. I. Widespread persistent gender bias compromises government's response to domestic violence, particularly when children are involved. (*Mississippi Univ. for Women v Hogan,* 458 US 718; *Craig v Boren,* 429 US 190; *Linda R. v Richard E.,* 162 AD2d 48; *Stanton v Stanton,* 421 US 7; *United States v Virginia,* 518 US 515.) II. This Court should interpret the Family Court Act to require a particularized showing of actions (or inactions) that constitute a failure to exercise a minimum degree of care. (*Childs v Childs,* 69 AD2d 406.) III. This Court should respond to the certified questions with guidelines that deter reliance on gender-based stereotypes.

*Piper Rudnick LLP,* Easton, Maryland (*Ray L. Earnest* of

counsel), for Appellate Advocacy Network and others, amici curiae. This Court should construe the Family Court Act as requiring that, in every proceeding to remove a child from his/her home, the court make a thorough inquiry into whether the child protection agency has made reasonable efforts to avoid removal. (*Stanley v Illinois,* 405 US 645; *Griswold v Connecticut,* 381 US 479; *Prince v Massachusetts,* 321 US 158; *Meyer v Nebraska,* 262 US 390; *Duchesne v Sugarman,* 566 F2d 817; *Covington v Harris,* 419 F2d 617; *Matter of Jacob,* 86 NY2d 651; *Kia P. v McIntyre,* 235 F3d 749; *Mathews v Eldridge,* 424 US 319; *May v Anderson,* 345 US 528.)

*Yisroel Schulman,* New York City, and *Kim Susser* for New York Legal Assistance Group and others, amici curiae. I. Appellant misappropriates the legislative history of Domestic Relations Law § 240 to support charges of neglect against battered mothers for failing to protect their children from exposure to domestic violence. (*People v Johnson,* 95 NY2d 368; *Matter of Bennett v Jeffreys,* 40 NY2d 543.) II. Appellant's policies and practice result in inconsistent and unrealistic demands imposed on battered mothers in custody and visitation proceedings and child protective proceedings. (*Matter of Blake v Blake,* 106 AD2d 916; *Matter of Smith v Purnell,* 256 AD2d 619; *Furman v Furman,* 298 AD2d 627; *Lorin B. v Michael S.,* 254 AD2d 126; *Matter of Thompson v Gibeault,* 305 AD2d 873; *Matter of J.D. v N.D.,* 170 Misc 2d 877; *Matter of E.R. v G.S.R.,* 170 Misc 2d 659; *Matter of Wissink v Wissink,* 301 AD2d 36; *Finn v Finn,* 176 AD2d 1132; *Entwistle v Entwistle,* 61 AD2d 380.) III. Appellants ignore successful models that exist to protect battered mothers and their children.

*Wilbur McReynolds,* amicus curiae.

*Legal Aid Society,* Cleveland, Ohio (*Alexandra M. Ruden* of counsel), and *Michael R. Smalz,* Columbus, Ohio, for Ohio Domestic Violence Network and another, amici curiae. I. An individualized assessment of harm to the child needs to be conducted. II. Removal is not always necessary or in the best interests of the child. (*Croft v Westmoreland County Children & Youth Servs.,* 103 F3d 1123.) III. Children should not be removed from a nonabusive parent because of exposure to parental domestic violence without a showing of harm to that child.

*Paul Chill,* Hartford, Connecticut, for Joseph L. Woolston and others, amici curiae. I. Removal from parents causes children

severe psychological harm, some of which may be mitigated if children are placed with relatives rather than strangers. (*Jordan by Jordan v Jackson,* 15 F3d 333.) II. No decision to remove a child should be made without considering the likely effects of the removal on the child's psychological health and without making a specific determination that the likely physical and psychological risk of continued exposure to violence outweighs the developmental risk likely to be caused by removal.

## OPINION OF THE COURT

Chief Judge KAYE.

In this federal class action, the United States Court of Appeals for the Second Circuit has certified three questions centered on New York's statutory scheme for child protective proceedings. The action is brought on behalf of mothers and their children who were separated because the mother had suffered domestic violence, to which the children were exposed, and the children were for that reason deemed neglected by her.

In April 2000, Sharwline Nicholson, on behalf of herself and her two children, brought an action pursuant to 42 USC § 1983 against the New York City Administration for Children's Services (ACS).[1] The action was later consolidated with similar complaints by Sharlene Tillet and Ekaete Udoh—the three named plaintiff mothers. Plaintiffs alleged that ACS, as a matter of policy, removed children from mothers who were victims of domestic violence because, as victims, they "engaged in domestic violence" and that defendants removed and detained children without probable cause and without due process of law. That policy, and its implementation—according to plaintiff mothers—constituted, among other wrongs, an unlawful interference with their liberty interest in the care and custody of their children in violation of the United States Constitution.

In August 2001, the United States District Court for the Eastern District of New York certified two subclasses: battered custodial parents (Subclass A) and their children (Subclass B) (*Nicholson v Williams,* 205 FRD 92, 95, 100 [ED NY 2001]). For each plaintiff, at least one ground for removal was that the custodial mother had been assaulted by an intimate partner and

---

1. "ACS" includes all named city defendants, including the City of New York. Apart from defendant John Johnson (Commissioner of the State Office of Children and Family Services, which oversees ACS), state officials are named in the complaint with respect to the assigned counsel portion of the case, which is not before us.

failed to protect the child or children from exposure to that domestic violence.

In January 2002, the District Court granted a preliminary injunction, concluding that the City "may not penalize a mother, not otherwise unfit, who is battered by her partner, by separating her from her children; nor may children be separated from the mother, in effect visiting upon them the sins of their mother's batterer" (*In re Nicholson*, 181 F Supp 2d 182, 188 [ED NY 2002]; *see also Nicholson v Williams*, 203 F Supp 2d 153 [ED NY 2002] [108-page elaboration of grounds for injunction]).

The court found that ACS unnecessarily, routinely charged mothers with neglect and removed their children where the mothers—who had engaged in no violence themselves—had been the victims of domestic violence; that ACS did so without ensuring that the mother had access to the services she needed, without a court order, and without returning these children promptly after being ordered to do so by the court;[2] that ACS caseworkers and case managers lacked adequate training about domestic violence, and their practice was to separate mother and child when less harmful alternatives were available; that the agency's written policies offered contradictory guidance or no guidance at all on these issues; and that none of the reform plans submitted by ACS could reasonably have been expected to resolve the problems within the next year (203 F Supp 2d at 228-229).

The District Court concluded that ACS's practices and policies violated both the substantive due process rights of mothers and children not to be separated by the government unless the parent is unfit to care for the child, and their procedural due process rights (181 F Supp 2d at 185). The injunction, in relevant part, "prohibit[ed] ACS from carrying out *ex parte* removals 'solely because the mother is the victim of domestic violence,' or from filing an Article Ten petition seeking removal on that

---

**2.** The District Court cited the testimony of a child protective manager that it was common practice in domestic violence cases for ACS to wait a few days before going to court after removing a child because "after a few days of the children being in foster care, the mother will usually agree to ACS's conditions for their return without the matter ever going to court" (203 F Supp 2d at 170).

basis" (*Nicholson v Scoppetta*, 344 F3d 154, 164 [2d Cir 2003] [internal citations omitted]).[3]

On appeal, the Second Circuit held that the District Court had not abused its discretion in concluding that ACS's practice of effecting removals based on a parent's failure to prevent his or her child from witnessing domestic violence against the parent amounted to a policy or custom of ACS, that in some circumstances the removals may raise serious questions of federal constitutional law, and that the alleged constitutional violations, if any, were at least plausibly attributable to the City (344 F3d at 165-167, 171-176).[4] The court hesitated, however, before reaching the constitutional questions, believing that resolution of uncertain issues of New York statutory law would avoid, or significantly modify, the substantial federal constitutional issues presented (*id.* at 176).

Given the strong preference for avoiding unnecessary constitutional adjudication, the importance of child protection to New York State and the integral part New York courts play in the removal process, the Second Circuit, by three certified questions, chose to put the open state statutory law issues to us for resolution. We accepted certification (1 NY3d 538 [2003]), and now proceed to answer those questions.[5]

## Certified Question No. 1: Neglect

"Does the definition of a 'neglected child' under N.Y. Family Ct. Act § 1012(f), (h) include instances in which the sole allegation of neglect is that the parent or other person legally responsible for the child's care allows the child to witness domestic abuse against the caretaker?" (344 F3d at 176.)

---

3. The injunction was stayed for six months to permit ACS to attempt reform on its own, free of the court's involvement, and to allow for an appeal. Thereafter, the City and ACS appealed, challenging the District Court's determination. The Second Circuit denied the City's request for an additional stay pending appeal.

4. Chief Judge Walker dissented, concluding that the injunction should be vacated because the evidence did not support the District Court's findings underpinning the injunction. In his view, the District Court's central factual finding that ACS had a policy of regularly separating battered mothers and children unnecessarily was "simply unsustainable" (*id.* at 177).

5. We are not asked to, nor do we, apply our answers to the trial record, though recognizing that in the inordinately complex human dilemma presented by domestic violence involving children, the law may be easier to state than apply.

■ We understand this question to ask whether a court reviewing a Family Court Act article 10 petition may find a respondent parent responsible for neglect based on evidence of two facts only: that the parent has been the victim of domestic violence, and that the child has been exposed to that violence. That question must be answered in the negative. Plainly, more is required for a showing of neglect under New York law than the fact that a child was exposed to domestic abuse against the caretaker. Answering the question in the affirmative, moreover, would read an unacceptable presumption into the statute, contrary to its plain language.

Family Court Act § 1012 (f) is explicit in identifying the elements that must be shown to support a finding of neglect. As relevant here, it defines a "neglected child" to mean:

"a child less than eighteen years of age

"(i) whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care . . .

"(B) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof, including the infliction of excessive corporal punishment; or by misusing a drug or drugs; or by misusing alcoholic beverages to the extent that he loses self-control of his actions; or by any other acts of a similarly serious nature requiring the aid of the court."

Thus, a party seeking to establish neglect must show, by a preponderance of the evidence (see Family Ct Act § 1046 [b] [i]), first, that a child's physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired and second, that the actual or threatened harm to the child is a consequence of the failure of the parent or caretaker to exercise a minimum degree of care in providing the child with proper supervision or guardianship. The drafters of article 10 were "deeply concerned" that an imprecise definition of child neglect might result in "unwarranted state intervention into private family life" (Besharov, Practice Commentaries, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 1012, at 320 [1999 ed]).

The first statutory element requires proof of actual (or imminent danger of) physical, emotional or mental impairment to the child (*see Matter of Nassau County Dept. of Social Servs. [Dante M.] v Denise J.*, 87 NY2d 73, 78-79 [1995]). This prerequisite to a finding of neglect ensures that the Family Court, in deciding whether to authorize state intervention, will focus on serious harm or potential harm to the child, not just on what might be deemed undesirable parental behavior. "Imminent danger" reflects the Legislature's judgment that a finding of neglect may be appropriate even when a child has not actually been harmed; "imminent danger of impairment to a child is an independent and separate ground on which a neglect finding may be based" (*Dante M.*, 87 NY2d at 79). Imminent danger, however, must be near or impending, not merely possible.

In each case, additionally, there must be a link or causal connection between the basis for the neglect petition and the circumstances that allegedly produce the child's impairment or imminent danger of impairment. In *Dante M.*, for example, we held that the Family Court erred in concluding that a newborn's positive toxicology for a controlled substance alone was sufficient to support a finding of neglect because the report, in and of itself, did not prove that the child was impaired or in imminent danger of becoming impaired (87 NY2d at 79). We reasoned, "[r]elying solely on a positive toxicology result for a neglect determination fails to make the necessary causative connection to all the surrounding circumstances that may or may not produce impairment or imminent risk of impairment in the newborn child" (*id.*). The positive toxicology report, in conjunction with other evidence—such as the mother's history of inability to care for her children because of her drug use, testimony of relatives that she was high on cocaine during her pregnancy and the mother's failure to testify at the neglect hearing—supported a finding of neglect and established a link between the report and physical impairment.

The cases at bar concern, in particular, alleged threats to the child's emotional, or mental, health. The statute specifically defines "[i]mpairment of emotional health" and "impairment of mental or emotional condition" to include

"a state of substantially diminished psychological or intellectual functioning in relation to, but not limited to, such factors as failure to thrive, control of aggressive or self-destructive impulses, ability to

think and reason, or acting out or misbehavior, including incorrigibility, ungovernability or habitual truancy" (Family Ct Act § 1012 [h]).

Under New York law, "such impairment must be clearly attributable to the unwillingness or inability of the respondent to exercise a minimum degree of care toward the child" (*id.*). Here, the Legislature recognized that the source of emotional or mental impairment—unlike physical injury—may be murky, and that it is unjust to fault a parent too readily. The Legislature therefore specified that such impairment be "clearly attributable" to the parent's failure to exercise the requisite degree of care.

Assuming that actual or imminent danger to the child has been shown, "neglect" also requires proof of the parent's failure to exercise a minimum degree of care. As the Second Circuit observed, "a fundamental interpretive question is what conduct satisfies the broad, tort-like phrase, 'a minimum degree of care.' The Court of Appeals has not yet addressed that question, which would be critical to defining appropriate parental behavior" (344 F3d at 169).

"[M]inimum degree of care" is a "baseline of proper care for children that all parents, regardless of lifestyle or social or economic position, must meet" (Besharov at 326). Notably, the statutory test is "*minimum* degree of care"—not maximum, not best, not ideal—and the failure must be actual, not threatened (*see e.g. Matter of Hofbauer*, 47 NY2d 648, 656 [1979] [recognizing, in the context of medical neglect, the court's role is not as surrogate parent and the inquiry is not posed in absolute terms of whether the parent has made the "right" or "wrong" decision]).

Courts must evaluate parental behavior objectively: would a reasonable and prudent parent have so acted, or failed to act, under the circumstances then and there existing (*see Matter of Jessica YY.*, 258 AD2d 743, 744 [3d Dept 1999]). The standard takes into account the special vulnerabilities of the child, even where general physical health is not implicated (*see Matter of Sayeh R.*, 91 NY2d 306, 315, 317 [1997] [mother's decision to demand immediate return of her traumatized children without regard to their need for counseling and related services "could well be found to represent precisely the kind of failure 'to exercise a minimum degree of care' that our neglect statute contemplates"]). Thus, when the inquiry is whether a mother—and domestic violence victim—failed to exercise a minimum

degree of care, the focus must be on whether she has met the standard of the reasonable and prudent person in similar circumstances.

As the Subclass A members point out, for a battered mother—and ultimately for a court—what course of action constitutes a parent's exercise of a "minimum degree of care" may include such considerations as: risks attendant to leaving, if the batterer has threatened to kill her if she does; risks attendant to staying and suffering continued abuse; risks attendant to seeking assistance through government channels, potentially increasing the danger to herself and her children; risks attendant to criminal prosecution against the abuser; and risks attendant to relocation.[6] Whether a particular mother in these circumstances has actually failed to exercise a minimum degree of care is necessarily dependent on facts such as the severity and frequency of the violence, and the resources and options available to her (see Matter of Melissa U., 148 AD2d 862 [3d Dept 1989]; Matter of James MM. v June OO., 294 AD2d 630 [3d Dept 2002]).

Only when a petitioner demonstrates, by a preponderance of evidence, that both elements of section 1012 (f) are satisfied may a child be deemed neglected under the statute. When "the sole allegation" is that the mother has been abused and the child has witnessed the abuse, such a showing has not been made. This does not mean, however, that a child can never be "neglected" when living in a household plagued by domestic violence. Conceivably, neglect might be found where a record establishes that, for example, the mother acknowledged that the children knew of repeated domestic violence by her paramour and had reason to be afraid of him, yet nonetheless allowed him several times to return to her home, and lacked awareness of any impact of the violence on the children, as in Matter of James MM. (294 AD2d at 632); or where the children were exposed to regular and continuous extremely violent conduct between their parents, several times requiring official intervention, and where caseworkers testified to the fear and distress the children were

---

6. The Legislature has recognized this "quandary" that a victim of domestic violence encounters (Senate Mem in Support, 2002 McKinney's Session Laws of NY, at 1861). To avoid punitive responses from child protective services agencies, the Legislature attempted to increase awareness of child protective agencies of the dynamics of domestic violence and its impact on child protection by amending the Social Services Law to mandate comprehensive domestic violence training for child protective services workers (id.).

experiencing as a result of their long exposure to the violence (*Matter of Theresa CC.*, 178 AD2d 687 [3d Dept 1991]).

In such circumstances, the battered mother is charged with neglect not because she is a victim of domestic violence or because her children witnessed the abuse, but rather because a preponderance of the evidence establishes that the children were actually or imminently harmed by reason of her failure to exercise even minimal care in providing them with proper oversight.

### Certified Question No. 2: Removals

Next, we are called upon to focus on removals by ACS, in answering the question:

> "Can the injury or possible injury, if any, that results
> to a child who has witnessed domestic abuse against
> a parent or other caretaker constitute 'danger' or
> 'risk' to the child's 'life or health,' as those terms
> are defined in the N.Y. Family Ct. Act §§ 1022, 1024,
> 1026-1028?" (344 F3d at 176-177.)

The cited Family Court Act sections relate to the removal of a child from home. Thus, in essence, we are asked to decide whether emotional injury from witnessing domestic violence can rise to a level that establishes an "imminent danger" or "risk" to a child's life or health, so that removal is appropriate either in an emergency or by court order.

While we do not reach the constitutional questions, it is helpful in framing the statutory issues to note the Second Circuit's outline of the federal constitutional questions relating to removals. Their questions emerge in large measure from the District Court's findings of an "agency-wide practice of removing children from their mother without evidence of a mother's neglect and without seeking prior judicial approval" (203 F Supp 2d at 215), and Family Court review of removals that "often fails to provide mothers and children with an effective avenue for timely relief from ACS mistakes" (*id.* at 221).

Specifically, as to ex parte removals, the Circuit Court identified procedural due process and Fourth Amendment questions focused on whether danger to a child could encompass emotional trauma from witnessing domestic violence against a parent, warranting emergency removal. Discussing the procedural due process question, the court remarked that:

> "there is a strong possibility that if New York law

does not authorize *ex parte* removals, our opinion in *Tenenbaum* at least arguably could weigh in favor of finding a procedural due process violation in certain circumstances. If New York law does authorize such removals, *Tenenbaum* likely does not prohibit us from deferring to that judgment. In either case, the underlying New York procedural rules will also be an important component of our balancing. Thus, the state-law question of statutory interpretation will either render unnecessary, or at least substantially modify, the federal constitutional question" (344 F3d at 172).[7]

The court also questioned whether "in the context of the seizure of a child by a state protective agency the Fourth Amendment might impose any additional restrictions above and beyond those that apply to ordinary arrests" (*id.* at 173).

As to court-ordered removals, the Second Circuit recognized challenges based on substantive due process, procedural due process—the antecedent of Certified Question No. 3—and the Fourth Amendment. The substantive due process question concerned whether the City had offered a reasonable justification for the removals. The Second Circuit observed that "there is a substantial Fourth Amendment question presented if New York law does not authorize removals in the circumstances alleged" (*id.* at 176).

Finally, in certifying the questions to us, the court explained that:

"[t]here is . . . some ambiguity in the statutory language authorizing removals pending a final determination of status. Following an emergency removal, whether *ex parte* or by court order, the Family Court must return a removed child to the parent's custody absent 'an imminent risk' or 'im-

---

7. In *Tenenbaum v Williams* (193 F3d 581 [2d Cir 1999]), a child's parents brought an action pursuant to 42 USC § 1983 challenging the New York City Child Welfare Administration's removal of their five year old from her kindergarten class—under the emergency removal provision of Family Court Act § 1024—and taking her to the emergency room where a pediatrician and a gynecologist examined her for signs of possible sexual abuse. When they found none, the child was returned to her parents. The Second Circuit reversed the District Court's judgment in pertinent part and held that a jury could have concluded that the emergency removal for the medical examination violated the parents' and child's procedural due process rights, and the child's Fourth Amendment rights.

minent danger' to 'the child's life or health.' At the same time, the Family Court must consider the 'best interests of the child' in assessing whether continuing removal is necessary to prevent threats to the child's life or health. Additionally, in order to support removal, the Family Court must 'find[ ] that removal is necessary to avoid imminent risk.' How these provisions should be harmonized seems to us to be the province of the Court of Appeals" (344 F3d at 169 [internal citations omitted]).

The Circuit Court summarized the policy challenged by plaintiffs and found by the District Court as "the alleged practice of removals based on a theory that allowing one's child to witness ongoing domestic violence is a form of neglect, either simply because such conduct is presumptively neglectful or because in individual circumstances it is shown to threaten the child's physical or emotional health" (*id.* at 166 n 5).

It is this policy, viewed in light of the District Court's factual findings, that informs our analysis of Certified Question No. 2. In so doing, we acknowledge the Legislature's expressed goal of "placing increased emphasis on preventive services designed to maintain family relationships rather than responding to children and families in trouble only by removing the child from the family" (*see Mark G. v Sabol*, 93 NY2d 710, 719 [1999] [emphasis omitted] [construing Child Welfare Reform Act of 1979 (L 1979, chs 610, 611)]). We further acknowledge the legislative findings, made pursuant to the Family Protection and Domestic Violence Intervention Act of 1994, that

"[t]he corrosive effect of domestic violence is far reaching. The batterer's violence injures children both directly and indirectly. Abuse of a parent is detrimental to children whether or not they are physically abused themselves. Children who witness domestic violence are more likely to experience delayed development, feelings of fear, depression and helplessness and are more likely to become batterers themselves" (L 1994, ch 222, § 1; *see also People v Wood*, 95 NY2d 509, 512 [2000] [though involving a batterer, not a victim]).

These legislative findings represent two fundamental—sometimes conflicting—principles. New York has long embraced a policy of keeping "biological families together" (*Matter of Marino S.*, 100 NY2d 361, 372 [2003]). Yet "when a child's best

interests are endangered, such objectives must yield to the State's paramount concern for the health and safety of the child" (*id.*).

As we concluded in response to Certified Question No. 1, exposing a child to domestic violence is *not* presumptively neglectful. Not every child exposed to domestic violence is at risk of impairment. A fortiori, exposure of a child to violence is not presumptively ground for removal, and in many instances removal may do more harm to the child than good. Part 2 of article 10 of the Family Court Act sets forth four ways in which a child may be removed from the home in response to an allegation of neglect (or abuse) related to domestic violence: (1) temporary removal with consent; (2) preliminary orders after a petition is filed; (3) preliminary orders before a petition is filed; and (4) emergency removal without a court order. The issue before us is whether emotional harm suffered by a child exposed to domestic violence, where shown, can warrant the trauma of removal under any of these provisions.

The Practice Commentaries state, and we agree, that the sections of part 2 of article 10 create a "continuum of consent and urgency and mandate a hierarchy of required review" before a child is removed from home (*see* Besharov, Practice Commentaries, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 1021, at 5 [1999 ed]).

Consent Removal

First, section 1021 provides that a child may be removed "from the place where he is residing with the written consent of his parent or other person legally responsible for his care, if the child is an abused or neglected child under this article" (Family Ct Act § 1021; *see Tenenbaum v Williams*, 193 F3d 581, 590 n 5 [2d Cir 1999]; *Matter of Jonathan P.*, 283 AD2d 675 [3d Dept 2001]). This section is significant because "many parents are willing and able to understand the need to place the child outside the home and because resort to unnecessary legal coercion can be detrimental to later treatment efforts" (Besharov at 6).

Postpetition Removal

■ If parental consent cannot be obtained, section 1027, at issue here, provides for preliminary orders after the filing of a neglect (or abuse) petition. Thus, according to the statutory continuum, where the circumstances are not so exigent, the agency should bring a petition and seek a hearing *prior to* re-

moval of the child. In any case involving abuse—or in any case where the child has already been removed without a court order—the Family Court must hold a hearing as soon as practicable after the filing of a petition, to determine whether the child's interests require protection pending a final order of disposition (Family Ct Act § 1027 [a]). As is relevant here, the section further provides that in any other circumstance (such as a neglect case), after the petition is filed any person originating the proceeding (or the Law Guardian) may apply for—or the court on its own may order—a hearing to determine whether the child's interests require protection, pending a final order of disposition (id.).[8]

For example, in *Matter of Adam DD.* (112 AD2d 493 [3d Dept 1985]), after filing a child neglect petition, petitioner Washington County Department of Social Services sought an order under section 1027. At a hearing, evidence demonstrated that respondent mother had told her son on several occasions that she intended to kill herself, and Family Court directed that custody be placed with petitioner on a temporary basis for two months. At the subsequent dispositional hearing, a psychiatrist testified that respondent was suffering from a type of paranoid schizophrenia that endangered the well-being of the child, and recommended the continued placement with petitioner. A second psychiatrist concurred. The Appellate Division concluded that the record afforded a basis for Family Court to find neglect because of possible impairment of the child's emotional health, and continued placement of the child with petitioner.

While not a domestic violence case, *Matter of Adam DD.* is instructive because it concerns steps taken in the circumstance where a child is emotionally harmed by parental behavior. The parent's repeated threats of suicide caused emotional harm that could be akin to the experience of a child who witnesses repeated episodes of domestic violence perpetrated against a parent. In this circumstance, the agency did not immediately remove the child, but proceeded with the filing of a petition and a hearing.

Upon such a hearing, if the court finds that removal is necessary to avoid imminent risk to the child's life or health, it is

---

**8.** Under section 1028, a parent or person legally responsible for the care of a child may petition the court for return of the child after removal, if he or she was not present or given an adequate opportunity to be present at the section 1027 hearing. The factors to be considered when returning a child removed in an emergency mirror those considered in an initial determination under sections 1027 and 1022—best interests, imminent risk, and reasonable efforts to avoid removal.

required to remove or continue the removal and remand the child to a place approved by the agency (Family Ct Act § 1027 [b] [i]). In undertaking this inquiry, the statute also requires the court to consider and determine whether continuation in the child's home would be contrary to the best interests of the child (*id.*).[9]

The Circuit Court has asked us to harmonize the "best interests" test with the calculus concerning "imminent risk" and "imminent danger" to "life or health" (344 F3d at 169). In order to justify a finding of imminent risk to life or health, the agency need not prove that the child has suffered actual injury (*see Matter of Kimberly H.*, 242 AD2d 35, 38 [1st Dept 1998]). Rather, the court engages in a fact-intensive inquiry to determine whether the child's emotional health is at risk. Section 1012 (h), moreover, sets forth specific factors, evidence of which may demonstrate "substantially diminished psychological or intellectual functioning" (*see also Matter of Sayeh R.*, 91 NY2d 306, 314-316 [1997]; *Matter of Nassau County Dept. of Social Servs. [Dante M.] v Denise J.*, 87 NY2d 73, 78-79 [1995]). As noted in our discussion of Certified Question No. 1, section 1012 (h) contains the caveat that impairment of emotional health must be "clearly attributable to the unwillingness or inability of the respondent to exercise a minimum degree of care toward the child" (*see Matter of Theresa CC.*, 178 AD2d 687 [3d Dept 1991]).

Importantly, in 1988, the Legislature added the "best interests" requirement to the statute, as well as the requirement that reasonable efforts be made "to prevent or eliminate the need for removal of the child from the home" (L 1988, ch 478, § 5).[10] These changes were apparently necessary to comport with federal requirements under title IV-E of the Social Security Act (42 USC §§ 670-679b), which mandated that federal "foster care maintenance payments may be made on behalf of otherwise eligible children who were removed from the home of a specified relative pursuant to a voluntary placement agreement, or as the result of a 'judicial determination to the effect that continuation therein would be contrary to the welfare of

---

**9.** The order must state the court's findings which support the necessity of removal, whether the parent was present at the hearing, what notice was given to the parent of the hearing and under what circumstances the removal took place (Family Ct Act § 1027 [b] [i]).

**10.** The Legislature added these provisions to sections 1022 and 1028 as well.

the child and . . . that reasonable efforts [to prevent the need for removal] have been made' " (Policy Interpretation Question of US Dept of Health & Human Servs, May 3, 1986, Bill Jacket, L 1988, ch 478, at 32-33). The measures "ensure[d] that children involved in the early stages of child protective proceedings and their families receive appropriate services to prevent the children's removal from their homes whenever possible" (Mem from Cesar A. Perales to Evan A. Davis, Counsel to Governor, July 27, 1988, Bill Jacket, L 1988, ch 478, at 14).

By contrast, the City at the time took the position that

"[t]he mixing of the standards 'best interest of the child' and 'imminent risk' is confusing. It makes no sense for a court to determine as part of an 'imminent risk' decision, what is in the 'best interest of the child.' If the child is in 'imminent risk', his/her 'best interest' is removal from the home. A 'best interest' determination is more appropriately made after an investigation and a report have been completed and all the facts are available" (Letter from Legis Rep James Brennan, City of New York Off of Mayor, to Governor Mario M. Cuomo, July 27, 1988, Bill Jacket, L 1988, ch 478, at 23).

In this litigation, the City posits that the "best interests" determination is part of the Family Court's conclusion that there is imminent risk warranting removal, and concedes that whether a child will be harmed by the removal is a relevant consideration. The City thus recognizes that the questions facing a Family Court judge in the removal context are extraordinarily complex. As the Circuit Court observed, "it could be argued that the exigencies of the moment that threaten the welfare of a child justify removal. On the other hand, a blanket presumption in favor of removal may not fairly capture the nuances of each family situation" (344 F3d at 174).

The plain language of the section and the legislative history supporting it establish that a blanket presumption favoring removal was never intended. The court *must do more* than identify the existence of a risk of serious harm. Rather, a court must weigh, in the factual setting before it, whether the imminent risk to the child can be mitigated by reasonable efforts to avoid removal. It must balance that risk against the harm removal might bring, and it must determine factually which course is in the child's best interests.

Additionally, the court must specifically consider whether imminent risk to the child might be eliminated by other means, such as issuing a temporary order of protection or providing services to the victim (Family Ct Act § 1027 [b] [iii], [iv]). The Committee Bill Memorandum supporting this legislation explains the intent that "[w]here one parent is abusive but the child may safely reside at home with the other parent, the abuser should be removed. This will spare children the trauma of removal and placement in foster care" (Mem of Children and Families Standing Comm, Bill Jacket, L 1989, ch 727, at 7).

These legislative concerns were met, for example, in *Matter of Naomi R.* (296 AD2d 503 [2d Dept 2002]), where, following a hearing pursuant to section 1027, Family Court issued a temporary order of protection against a father, excluding him from the home, on the ground that he allegedly sexually abused one of his four children. Evidence established that the father's return to the home, even under the mother's supervision, would present an imminent risk to the health and safety of all of the children. Thus, pending a full fact-finding hearing, Family Court took the step of maintaining the integrity of the family unit and instead removed the abuser.

Ex Parte Removal by Court Order

■ If the agency believes that there is insufficient time to file a petition, the next step on the continuum should not be emergency removal, but ex parte removal by court order (*see e.g. Matter of Nassau County Dept. of Social Servs. [Dante M.] v Denise J.*, 87 NY2d 73 [1995]). Section 1022 of the Family Court Act provides that the court may enter an order directing the temporary removal of a child from home *before* the filing of a petition if three factors are met.

First, the parent must be absent or, if present, must have been asked and refused to consent to temporary removal of the child and must have been informed of an intent to apply for an order. Second, the child must appear to suffer from abuse or neglect of a parent or other person legally responsible for the child's care to the extent that immediate removal is necessary to avoid imminent danger to the child's life or health. Third, there must be insufficient time to file a petition and hold a preliminary hearing.

Just as in a section 1027 inquiry, the court must consider whether continuation in the child's home would be contrary to the best interests of the child; whether reasonable efforts were

made prior to the application to prevent or eliminate the need for removal from the home; and whether imminent risk to the child would be eliminated by the issuance of a temporary order of protection directing the removal of the person from the child's residence.[11] Here, the court must engage in a fact-finding inquiry into whether the child is at risk and appears to suffer from neglect.

The Practice Commentaries suggest that section 1022 may be unfamiliar, or seem unnecessary, to those in practice in New York City, "where it is common to take emergency protective action without prior court review" (Besharov, Practice Commentaries, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 1022, at 10 [1999 ed]). If, as the District Court's findings suggest, this was done in cases where a court order could be obtained, the practice contravenes the statute. Section 1022 ensures that in most urgent situations, there will be judicial oversight in order to prevent well-meaning but misguided removals that may harm the child more than help. As the comment to the predecessor statute stated, "[t]his section . . . [is] designed to avoid a premature removal of a child from his home by establishing a procedure for an early judicial determination of urgent need" (Committee Comments, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 322 [1963 ed]).

Whether analyzing a removal application under section 1027 or section 1022, or an application for a child's return under section 1028, a court must engage in a balancing test of the imminent risk with the best interests of the child and, where appropriate, the reasonable efforts made to avoid removal or continuing removal. The term "safer course" (see e.g. Matter of Kimberly H., 242 AD2d 35 [1st Dept 1998]; Matter of Tantalyn TT., 115 AD2d 799 [3d Dept 1985]) should not be used to mask a dearth of evidence or as a watered-down, impermissible presumption.

Emergency Removal Without Court Order

■ Finally, section 1024 provides for emergency removals without a court order. The section permits removal without a court order and without consent of the parent if there is reasonable cause to believe that the child is in such urgent circumstance or condition that continuing in the home or care of the

---

11. The order must state the court's findings concerning the necessity of removal, whether respondent was present at the hearing and what notice was given.

parent presents an imminent danger to the child's life or health, and there is not enough time to apply for an order under section 1022 (Family Ct Act § 1024 [a]; *see generally Matter of Joseph DD.*, 300 AD2d 760, 760 n 1 [3d Dept 2002] [noting that removal under such emergency circumstances requires the filing of an article 10 petition "forthwith" and prompt court review of the nonjudicial decision pursuant to Family Ct Act § 1026 (c) and § 1028]; *see also Matter of Karla V.*, 278 AD2d 159 [1st Dept 2000]). Thus, emergency removal is appropriate where the danger is so immediate, so urgent that the child's life or safety will be at risk before an ex parte order can be obtained. The standard obviously is a stringent one.

Section 1024 establishes an objective test, whether the child is in such circumstance or condition that remaining in the home presents imminent danger to life or health.[12] In construing "imminent danger" under section 1024, it has been held that whether a child is in "imminent danger" is necessarily a fact-intensive determination. "It is not required that the child be injured in the presence of a caseworker nor is it necessary for the alleged abuser to be present at the time the child is taken from the home. It is sufficient if the officials have persuasive evidence of serious ongoing abuse and, based upon the best investigation reasonably possible under the circumstances, have reason to fear imminent recurrence" (*Gottlieb v County of Orange*, 871 F Supp 625, 628-629 [SD NY 1994], citing *Robison v Via*, 821 F2d 913, 922 [2d Cir 1987]). The *Gottlieb* court added that, "[s]ince this evidence is the basis for removal of a child, it should be as reliable and thoroughly examined as possible to avoid unnecessary harm to the family unit" (871 F Supp at 629).

Section 1024 concerns, moreover, only the very grave circumstance of danger to life or health. While we cannot say, for all future time, that the possibility can *never* exist, in the case of emotional injury—or, even more remotely, the risk of emotional injury—caused by witnessing domestic violence, it must be a rare circumstance in which the time would be so fleeting and

---

**12.** Section 1022 also requires that the child be brought immediately to a social services department, that the agency make every reasonable effort to inform the parent where the child is and that the agency give written notice to the parent of the right to apply to Family Court for return of the child.

the danger so great that emergency removal would be warranted.[13]

### Certified Question No. 3: Process

Finally, the Second Circuit asks us:

"Does the fact that the child witnessed such abuse suffice to demonstrate that 'removal is necessary,' N.Y. Family Ct. Act §§ 1022, 1024, 1027, or that 'removal was in the child's best interests,' N.Y. Family Ct. Act §§ 1028, 1052(b)(i)(A), or must the child protective agency offer additional, particularized evidence to justify removal?" (344 F3d at 177.)

■ The Circuit Court has before it the procedural due process question whether, if New York law permits a presumption that removal is appropriate based on the witnessing of domestic violence, that presumption would comport with *Stanley v Illinois* (405 US 645 [1972] [recognizing a father's procedural due process interest in an individualized determination of fitness]). All parties maintain, however, and we concur, that under the Family Court Act, there can be no "blanket presumption" favoring removal when a child witnesses domestic violence, and that each case is fact-specific. As demonstrated in our discussion of Certified Question No. 2, when a court orders removal, particularized evidence must exist to justify that determination, including, where appropriate, evidence of efforts made to prevent or eliminate the need for removal and the impact of removal on the child.

The Circuit Court points to two cases in which removals occurred based on domestic violence without corresponding expert testimony on the appropriateness of removal in the particular circumstance (*Matter of Carlos M.*, 293 AD2d 617 [2d Dept 2002]; *Matter of Lonell J.*, 242 AD2d 58 [1st Dept 1998]). Both cases were reviewed on the issue whether there was sufficient evidence to support a finding of neglect. In *Carlos M.*, the evidence showed a 12-year history of domestic violence between the parents which was not only witnessed by the children but also often actually spurred their intervention. In *Lonell J.*,

---

13. Section 1026 permits the return of a child home, without court order, in a case involving neglect, when an agency determines in its discretion that there is no imminent risk to the child's health in so doing (Family Ct Act § 1026 [a], [b]). If the agency does not return the child for any reason, the agency must file a petition forthwith, or within three days if good cause is shown (Family Ct Act § 1026 [c]).

caseworkers testified at a fact-finding hearing about the domestic violence perpetrated by the children's father against their mother, as well as the unsanitary condition of the home and the children's poor health.

We do not read *Carlos M.* or *Lonell J.* as supportive of a presumption that if a child has witnessed domestic violence, the child has been harmed and removal is appropriate. That presumption would be impermissible. In each case, multiple factors formed the basis for intervention and determinations of neglect. As the First Department concluded in *Lonell J.,* moreover, "nothing in section 1012 itself requires expert testimony, as opposed to other convincing evidence of neglect" (242 AD2d at 61). Indeed, under section 1046 (a) (viii), which sets forth the evidentiary standards for abuse and neglect hearings, competent expert testimony on a child's emotional condition *may* be heard. The *Lonell J.* court expressed concern that while older children can communicate with a psychological expert about the effects of domestic violence on their emotional state, much younger children often cannot (242 AD2d at 62). The court believed that "[t]o require expert testimony of this type in the latter situation would be tantamount to refusing to protect the most vulnerable and impressionable children. While violence between parents adversely affects all children, younger children in particular are most likely to suffer from psychosomatic illnesses and arrested development" (*id.*).

Granted, in some cases, it may be difficult for an agency to show, absent expert testimony, that there is imminent risk to a child's emotional state, and that any impairment of emotional health is "clearly attributable to the unwillingness or inability of the respondent to exercise a minimum degree of care toward the child" (Family Ct Act § 1012 [h]). Yet nothing in the plain language of article 10 requires such testimony. The tragic reality is, as the facts of *Lonell J.* show, that emotional injury may be only one of the harms attributable to the chaos of domestic violence.

Accordingly, the certified questions should be answered in accordance with this opinion.

Judges G.B. SMITH, CIPARICK, ROSENBLATT, GRAFFEO, READ and R.S. SMITH concur.

Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.17 of the Rules of

Practice of the Court of Appeals (22 NYCRR 500.17), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified questions answered in accordance with the opinion herein.