Matter of Jake G. v Jorge G. (2024 NY Slip Op 50421(U))

[*1]

Matter of Jake G. v Jorge G.

2024 NY Slip Op 50421(U)

Decided on March 21, 2024

Family Court, Kings County

Deane, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 21, 2024
Family Court, Kings County

In the Matter of a Proceeding under Article 10 
 of the Family Court Act on behalf of Jake G., Lenny G., George G.

against
Jorge G., Respondent.

File No. XXXXXX

Christina Irrera, JD, and John Maggio, Esq. 
Administration for Children's Services
Family Court Legal Services
Counsel for the Petitioner
Julian Montijo, Esq. 
Brooklyn Defender Services
Family Defense Practice
Counsel for the Respondent
Fred Wertheimer, Esq. 
Assigned Counsel Panel
195 Montague Street, Suite 1105
Brooklyn, NY 11201
Counsel for the Non-Respondent Parent
Richard Colodny, Esq. 
Assigned Counsel Panel
300 Cadman Plaza West, 12th Floor Brooklyn, NY 11201
Counsel for the Children

Jacqueline B. Deane, J.

Procedural History
This Court held an emergency hearing today pursuant to Family Court Act § 1028 after the Respondent father, Mr. G., requested to be permitted to return to the home of his three boys, ages 12, 11 and 8. The father's application is supported by the Attorney for the Children ("AFC"). The Administration for Children's Services ("ACS" or "Petitioner") introduced several exhibits and made the Caseworker Supervisor available for cross-examination and rested. For the reasons stated below, this Court granted the prima facie motion made by the Respondent and the AFC.
ACS filed this neglect petition on February 5, 2024, based on an allegation of excessive corporeal punishment due to the father's hitting the 12-year-old subject child Jake with a belt twice in the arm on January 30th and Jake's claims that he had been hit with a belt in the past. The father was arrested after Jake called the police and was later released by Criminal Court with an order of protection in favor of the child Jake and subject to subsequent Family Court orders. At the first court appearance here, ACS requested that the three children be released to their mother, Ms. H. with the father excluded from the family home and his visits supervised. Mr. G. has complied with those orders since.
Given that the father's work schedule as a cab driver made agency supervised visits impossible, the boys had minimal visits with their father since that time. The stress the court orders have put on the family since has been evident in court appearances, as the mother has been left to handle three young boys, ages 12, 11 and 8, on her own. The Court notes that the parents are both primary Spanish-speakers and that the father is their sole source of support working 12-hour days, 7 days a week, as a cab driver.
In an ACS Court Report submitted to the Court and all parties on the March 14th court date, the caseworker verified that the father had completed one third of the anger management and parenting skills program that he had engaged in on his own soon after the case was filed, and the case manager of the program reported that he was an active participant and had shown insight. There had been no concerns with the father's supervised visits and all 3 boys, including Jake, expressed to the caseworker that they missed their father, were not fearful of him and wanted him to return home. As a result, this Court permitted the father evening visits in the home for 3 hours each day which have been in place for the past week. The Respondent father requested to be allowed to return to the home fulltime and this hearing pursuant to FCA § 1028 was held today.
ACS introduced ORTs, several pages of case records and photographs into evidence and rested. The photographs show faint redness on Jake's right upper arm and a mark below his elbow. The case records reference redness and one "welt." There were no medical records introduced. On cross-examination of the casework supervisor, she reported that the family had accepted preventive services, which was already in the home, and that the father completed one random toxicology screen which was negative. Additionally, a caseworker observed one of the father's visits in the home this week, again without any safety concerns, and the children and mother continued to want the father to return. The caseworker testified that the two younger boys reported that they had never been hit by their father and they usually were not allowed to [*2]play video games as punishment. The supervisor also confirmed that the subject child Jake is diagnosed with ADHD and receives therapy and takes medication for his behavior issues. At the prima facie motion made by the father, the AFC argued strenuously on behalf of the 3 boys for their father's return home, which was also strongly supported by counsel for the mother.
For the purpose of the prima facie motion, this Court accepted as true that the Respondent father used a belt to discipline his almost 13-year-old son Jake on January 30th and the mother was upset with the child Jake at the hospital for calling the police and saying that his father hit him. These are the bases of ACS's opposition to allowing the Respondent father back in the home. However, this is merely the beginning of the required legal analysis at a hearing pursuant to FCA § 1028, not the end.
Family Court Act § 1028 states:
Upon the application of the parent . . . for the care of a child temporarily removed under this part . . . the court shall hold a hearing to determine whether the child should be returned . . . Upon such hearing, the court shall grant the application, unless it finds that the return presents an imminent risk to the child's life or health.
In Nicholson v Scopetta, 3 NY3d 357, 376 [2004], the Court of Appeals recognized the real emotional harm that children often suffer when removed from their parents and required Courts to carefully balance that harm against risk of return. See Nicholson 3 NY3d at 378-79. This Court must "weigh, in the factual setting before it, whether the imminent risk to the child can be mitigated by reasonable efforts to avoid removal. It must balance that risk against the harm removal might bring, and it must determine factually which course is in the child's best interests. Additionally, the court must specifically consider whether imminent risk to the child might be eliminated by other means, such as issuing a temporary order of protection or providing services to the victim." Id.
Thus, even accepting all of the allegations as true, the Court must assess whether court orders can be put in place that would eliminate or mitigate any imminent risk which would exist if the father returns home. Notably, both parents have obeyed the order excluding the father from the home and limiting his contact with the children since this case was filed almost 2 months ago, even though this meant extremely limited contact with the 3 boys who were expressing upset at missing their father as reported by their attorney. The fact that both parents complied with an order that went against their, and the children's, wishes is highly significant to this Court and predictive of their willingness to comply with orders in the future. The purpose of the Family Court, and ACS's intervention in particular, is remedial - with the objective of reunifying families as soon as safely possible. There are occasions when the effect of court intervention and the resulting ramifications are enough to change behavior sufficiently to reduce or eliminate the risk of harm. This Court has had the opportunity to see the impact of the consequences that these particular parents have faced, with Mr. G. arrested and excluded from the family home for two months, followed by their complete compliance with the court orders and voluntary engagement with services since then, is sufficient evidence for this Court to find that the Respondent father can return home with protective orders in place.
The evidence at this hearing showed that the use of a belt is not the father's primary or regular discipline practice. Rather it was a response to defiant behavior by his almost 13-year-old son who has a history of behavioral regulation issues which, according to the mother, have become much worse in recent months. In the case records, Petitioner's Ex. 5e in evidence, Ms. [*3]H. expressed to the caseworker the depth and severity of the challenges she was having with Jake, her concerns about him, and her desire for and openness to any services for Jake. The two younger boys stated that their father generally takes away privileges to discipline them and had never used a belt on them and no marks were seen on either of them. While the Court does not condone use of a belt as discipline, this is not per se neglect under the law and the issue of what is "excessive" is one for fact-finding.
ACS has also raised concern about the Court's ability to rely on the mother to enforce orders and protect the children given her statements to Jake on the night these events unfolded. This Court does not believe that Ms. H.'s reliability in following court orders should be judged solely based on her behavior during the highly emotional events that unfolded on the night of January 30th. Based on the mother's statements to the caseworker contained in Petitioner's Ex. 5b in evidence, she was on the phone in another room and only heard the father yelling at Jake over Jake's refusal to help with the laundry. The next thing she knew, the police were at her home, having been called by Jake, saying the father had hit Jake with a belt. The mother did not witness nor hear this happen, nor did the other children. The father was then arrested, and the mother and children were brought to the hospital by the police and ACS was called. In this midst of this upheaval to a normal family evening, the mother evidently responded emotionally, according to Petitioner's exhibit, asking Jake why he had called the police and telling him that he "should tell the truth and his father did not hit him." Petitioner's Ex. 5c in evidence. Under those circumstances, without endorsing her response, this Court can appreciate why Ms. H. reacted in this way and that this was not a considered, thought through response about how to handle the turmoil her family has suffered. In contrast to this one night, Ms. H. has followed court orders for 50 days since, even though those orders have added stress to her life and caused her and her children emotional harm. This Court believes Ms. H. has demonstrated that she can be relied on to continue to act as she has for the past 50 days, rather than on that 1 extremely difficult night, and comply with new orders with the father back in the home.
Pursuant to the balancing required by the Court of Appeals in Nicholson, this Court finds that, under the particularized facts of this case, the Court finds the emotional and mental harm, and added family stress, of continued separation from their father to be greater than any physical risk to the children of his return home and such a return is in their best interests. Thus, Mr. G.'s application pursuant to FCA § 1028 to return to the home is granted prima facie and the Court hereby orders that the subject children are to be released to the care and custody of both parents under the following conditions:
1) Both parents are to cooperate with ACS supervision including announced or unannounced home visits.
2) Both parents are to comply with preventive services including any reasonable referrals;
3) The Respondent father is to comply with a TOP not to use any corporal punishment on the subject children;
4) The Respondent father is to continue to comply with anger management and parenting skills classes;
5) Both parents are to insure that the child Jake attends school, individual therapy and [*4]medication management;
6) The mother is required to enforce the TOP and inform ACS if there are any violations as well as take any protective measures needed.
Dated: March 21, 2024
ENTER:
The Hon. Jacqueline B. Deane