## State of New York
## Supreme Court, Appellate Division
## Third Judicial Department

Decided and Entered:  July 10, 2014                    514149
_____

In the Matter of DIANE C.,
                    Appellant,

       v

RICHARD B., Also Known as
    ALLEN D.,
                    Respondent,
                    et al.,
                    Respondent.

(Proceeding No. 1.)
_____

In the Matter of ALLEN D.,
                    Respondent,

       v                                    MEMORANDUM AND ORDER

DIANE C.,
                    Appellant.

(Proceeding No. 2.)

(And Three Other Related Proceedings.)
_____

In the Matter of DAVID B.,
    Alleged to be a Neglected
    Child.

CHENANGO COUNTY DEPARTMENT OF
    SOCIAL SERVICES,
                    Respondent;

DIANE C.,
                    Appellant.

(Proceeding No. 6.)
_____

Calendar Date:  June 4, 2014

Before:  Stein, J.P., Rose, Egan Jr. and Clark, JJ.

_____

Abbie Goldbas, Utica, for appellant.

Sarah C. Fitzpatrick, Chenango County Department of Social Services, Norwich, for Chenango County Department of Social Services, respondent.

Paul R. Corradini, Elmira, for Allen D., respondent.

Patrick Flanagan, Norwich, attorney for the child.

_____

Clark, J.

Appeals (1) from an order of the Family Court of Chenango County (Campbell, J.), entered February 23, 2012, which granted petitioner's application, in proceeding No. 6 pursuant to Family Ct Act article 10, to adjudicate David B. to be a neglected child, and (2) from an order of said court, entered March 1, 2012, which, among other things, granted petitioner's application, in proceeding No. 2 pursuant to Family Ct Act article 6, to modify a prior order of custody.

Richard B., also known as Allen D. (hereinafter the father),[1] and respondent Cheryl E. (hereinafter the mother) are the parents of the subject child (born in 2004).  Diane C. (hereinafter the grandmother) is the child's paternal grandmother.  In 2005, when the father was incarcerated and the mother was allegedly homeless, the grandmother was awarded sole

_____

[1]  The father's birth name was Richard B.  However, the father was purportedly adopted at some point and, at that time, his name was changed to Allen D., which is the name he now goes by.

custody of the child.  In November 2010, the father, who had been released from incarceration, and the grandmother consented to modify a prior order of custody so as to award the father a schedule of unsupervised visitation with the child.  Just one month later, the grandmother commenced the first of these proceedings, seeking to modify the November 2010 custody order by suspending visitation with the father based upon an allegation that he had sexually abused the child.  Shortly thereafter, the father commenced the second of these proceedings also seeking to modify the November 2010 custody order by removing the child from the grandmother's care.[2]  Following a court-ordered investigation, it was determined that the sexual abuse allegation was unfounded.

In 2011, petitioner Chenango County Department of Social Services (hereinafter DSS) commenced proceeding No. 6 against the grandmother alleging, among other things, that she neglected the child by failing to provide proper supervision and effectively alienating him from the father.  Following a prolonged fact-finding hearing, Family Court granted that petition and determined that the grandmother had neglected the child.  Family Court then proceeded to conduct a combined dispositional hearing and hearing on the pending modification petitions.  Thereafter, the court entered an order in the neglect proceeding and a final order in the custody proceedings that, among other things, granted sole custody to the father and terminated visitations between the child and the grandmother.  The grandmother now appeals from both orders.

We affirm.  The grandmother argues that DSS failed to prove neglect by a preponderance of the evidence or, alternatively, that, even if DSS properly proved the allegations of the petition, Family Court's dispositional order was in error.  "To establish neglect, a petitioner must demonstrate, by a preponderance of the evidence, that the child's physical, mental or emotional condition has been impaired or is in imminent danger

_____

[2]  Between them, the grandmother and the father subsequently commenced three additional proceedings each seeking to modify custody for various reasons.

of becoming impaired due to the failure of the parent or caretaker to exercise a minimum degree of care" (Matter of Josephine BB. [Rosetta BB.], 114 AD3d 1096, 1097 [2014]; see Family Ct Act §§ 1012 [f] [i]; 1046 [b] [i]; Nicholson v Scoppetta, 3 NY3d 357, 368 [2004]). Determining "whether a parent is exercising a minimum degree of care requires an objective evaluation of the parent's behavior, in light of whether a reasonable and prudent parent would have so acted, or failed to act, under the circumstances" (Matter of Daniel X. [Monica X.], 114 AD3d 1059, 1060 [2014]; see Nicholson v Scoppetta, 3 NY3d at 370; Matter of Josephine BB. [Rosetta BB.], 114 AD3d at 1097). In reviewing a finding of neglect, "we accord deference to the court's credibility and factual determinations, in view of its ability to observe the testimony, particularly that of the [parties]" (Matter of Perry v Surplus, 112 AD3d 1077, 1080 [2013]; see Matter of Josephine BB. [Rosetta BB.], 114 AD3d at 1100), and its finding will not be disturbed so long as it is supported by a sound and substantial basis in the record (see Matter of Josephine BB. [Rosetta BB.], 114 AD3d at 1097; Matter of Daniel X. [Monica X.], 114 AD3d at 1061).

In our view, there is a sound and substantial basis in the record before us to support Family Court's determination that the grandmother's longstanding pattern of behavior constituted neglect. Specifically, proof in the form of the testimony of numerous witnesses, including the grandmother herself, adequately supports Family Court's finding. For example, Linda Lee-Smith, a DSS employee, testified that she became involved in the child's case in 2005, when his paternal aunt, Daralynn B. — one of the grandmother's daughters — petitioned for visitation. While facilitating such visits, Lee-Smith repeatedly observed the grandmother upsetting the child and then taking photos once he began crying. Lee-Smith also testified that the grandmother alleged that the child was mistreated and abused during his visits with Daralynn.[3] Daralynn explained that, within a short

_____

[3] The grandmother alleged that the child was losing weight during his visits with Daralynn and began having the child weighed at the pediatrician's office before and after every visitation. When the child's doctor did not confirm the

time of being awarded visitation with the child, the grandmother commenced three proceedings against her to restrict those visits based upon false allegations. Jamie B., another of the grandmother's daughters, testified at the fact-finding hearing that, since approximately 2009, she has visited the grandmother's house regularly and observed the grandmother and the child interact. Jamie testified to numerous alarming conversations between the grandmother and the child, during which the grandmother told the child to say that the father was touching him in a sexual way or was physically abusing him. According to Jamie, the grandmother would threaten the child that, if he did not make these allegations against the father, he would have his legs "chopped off" and be "in a wheelchair."

Crystal Cornell, a former child protective services caseworker, testified that, between March 2011 and October 2011, she investigated eight child protective reports regarding the father, all of which originated with the grandmother. In this regard, Cornell explained that the grandmother was intentionally seeking out mandatory reporters to tell them about alleged sexual abuse and, to that end, had brought the child to the emergency room 14 times over a nine-month period seeking to substantiate her allegations of abuse against the father. Notably, Cornell emphasized that all of her investigations ultimately exonerated the father and, instead, indicated misconduct on behalf of the grandmother. Kelly O'Connor, a child protective worker employed by DSS, also testified that in November 2011, when investigating yet another allegation of sexual abuse against the father, the child disclosed that the grandmother had told him to say that the father had inappropriately touched him. Likewise, Debra Kman, a psychotherapist who supervised visits between the father and the child, testified that, in late 2011, the child disclosed to her that the grandmother had told him to say that the father had inappropriately touched him and had burned him with a cigarette.

---

grandmother's suspicions of abuse, she changed his pediatrician. The grandmother explained that she switched doctors because she felt that the original pediatrician was being influenced by child protective services.

Further, Isabella Rauh-Ivers, the court-appointed forensic psychologist, testified that the child was "very clear and very consistent" that he had never been sexually or physically abused, and admitted that he had lied about the abuse. After interviewing the grandmother, Rauh-Ivers diagnosed her with having "an obsessional, compulsive personality disorder . . . with a variety of different features that include[] narcissistic histrionics, schizotypal and dependent features," and testified to the negative impact that the grandmother's behavior has had on the child. Rauh-Ivers testified to the positive attributes possessed by the father and explained that, despite his prior involvement with the criminal justice system, there was no indication that he is a pedophile or that he has ever molested a child. Finally, while Vincent Monastra, a psychologist who treated the child for a substantial period of time between 2008 and 2011, testified on behalf of the grandmother that her behavior was not inappropriate, Monastra did acknowledge that the child's reporting of abuse was not consistent over time and changed depending on who was present during a particular session. Moreover, the grandmother testified at length that she had reported the allegations of abuse because she genuinely believed that the father had abused the child, but Family Court properly rejected that testimony as inconsistent with the facts.

Viewing the grandmother's longstanding pattern of behavior objectively (see Matter of Daniel X. [Monica X.], 114 AD3d at 1060), there is a sound and substantial basis for Family Court's finding of neglect as a result of her failure to exercise a minimum degree of care (see Matter of Julian K., 23 AD3d 717, 718-719 [2005]; Matter of Christine II., 13 AD3d 922, 923 [2004]; see also Matter of Josephine BB [Rosetta BB.], 114 AD3d at 1100). Family Court carefully set forth each and every basis to support its ultimate conclusion in a lengthy, thorough decision, and we accord deference to the court's credibility determinations – its finding that the grandmother's testimony was not credible, in particular.

We next reject the grandmother's assertion that Family Court, in its dispositional order, should have allowed her to maintain custody of the child and should not have terminated her supervised visits with him. A "dispositional order must reflect

a resolution consistent with the best interests of the child[]
after consideration of all relevant facts and circumstances"
(Matter of Alaina E., 33 AD3d 1084, 1087 [2006]; accord Matter of
Kaleb U. [Heather V.–Ryan U.], 77 AD3d 1097, 1099-1100 [2010]).
The appropriate inquiry in this regard "involves consideration of
the parent's [or caretaker's] ability to supervise the child and
any potential threat of future abuse or neglect" (Matter of
Kathleen OO., 232 AD2d 784, 786 [1996]; accord Matter of Victoria
XX. [Thomas XX.], 110 AD3d 1168, 1171 [2013]; Matter of Hobb Y.,
56 AD3d 998, 999 [2008]).  Further, as is particularly relevant
here, "[t]he [s]tate may not deprive a parent of the custody of a
child absent surrender, abandonment, persisting neglect,
unfitness or other like extraordinary circumstances" (Matter of
Bennet v Jeffreys, 40 NY2d 543, 544 [1976]; accord Matter of Fynn
S., 56 AD3d 959, 961 [2008]).

The record reflects that the best interests of the child
are served by awarding the father custody and terminating the
grandmother's visitation with him.  At the dispositional hearing,
Kathryne Lavoie, a DSS employee who supervised visits between the
grandmother and the child during the pendency of the proceedings,
testified that she observed the grandmother violating visitation
rules and making inappropriate comments to the child that
resulted in the child crying.  Likewise, Deborah Munyan, another
of DSS's caseworkers who supervised visits between the
grandmother and the child, stated that the grandmother disobeyed
visitation rules.

The father's testimony established that he is employed full
time and lives in a three-bedroom apartment with his wife, her
twin sons, their child and the subject child.  The father is
involved in the child's education, his counseling and his extra-
curricular activities and adamantly denies ever abusing the
child.  While the father explained that he did not believe it was
in the child's best interests to visit with the grandmother, he
agreed to adhere to any court-ordered visitation.

With regard to disposition, Rauh-Ivers testified that,
since residing with the father, the child has been able to
express a "liveliness or dimensionality" that was not present
when he was living with the grandmother.  The child now refers to

the father as "daddy," he is doing very well in school, and he no longer takes the anti-anxiety medication he was on when he lived with the grandmother.  Notably, Rauh-Ivers expressed her concern that, if the child were placed in the grandmother's custody, "there would be a substantial risk that he would essentially not be permitted or afforded opportunities to maintain or sustain a meaningful relationship with [the father]" and, therefore, the best interests of the child would be served by placing him in the custody of the father.  While stating that, "in the best of all worlds there should be some contact" between the grandmother and the child in a monitored setting, Rauh-Ivers nonetheless expressed her concern that the grandmother would influence or undermine the child, even in a supervised setting.  Accordingly, we agree with Family Court that the best interests of the child are best served by awarding the father sole custody and terminating the grandmother's visitation with the child inasmuch as visitation poses the likelihood of further emotional and psychological harm to the child (see Matter of Trombley v Trombley, 301 AD2d 890, 891-892 [2003]; see also Matter of Victoria XX. [Thomas XX.], 110 AD3d at 1171-1172).

The grandmother's remaining contentions, including those raised in her pro se brief, are either unpreserved or without merit.

Stein, J.P., Rose and Egan Jr., JJ., concur.


ORDERED that the orders are affirmed, without costs.




ENTER:

Robert D. Mayberger
Clerk of the Court