*354 OPINION OF THE COURT
Jacqueline B. Deane, J.
This proceeding began with the filing of a neglect petition against the respondent father, pursuant to article 10 of the Family Court Act, alleging that he perpetrated a single incident of domestic violence against the non-respondent mother and subject children on April 5, 2015, in which the respondent father was alleged to have been drinking alcohol while the subject children were present. This fact-finding hearing commenced on October 26, 2015 and continued over several adjourn dates, finally concluding on April 21, 2016. Petitioner (Administration for Children’s Services [ACS]) called caseworker R. who responded to an oral report transmittal which was introduced into evidence as petitioner’s exhibit 1 with the hearsay portions redacted. Petitioner attempted to introduce the tape recording of the 911 call leading to the respondent father’s criminal arrest and prosecution but the recording was precluded by the court pursuant to CPL 160.50 since the underlying criminal case was dismissed and sealed. The respondent, Mr. K., testified on his own behalf. The Attorney for the Child, who opposes a finding, rested without introducing any evidence. Counsel then made their summations and this court reserved decision.
The court has reviewed the exhibits and considered the credibility of the two witnesses. Taken in total, this evidence is not sufficient for the court to find, by a preponderance of the evidence, that the respondent father neglected the subject children as defined by Family Court Act § 1012 based on the alleged incident of domestic violence against the non-respondent mother, Ms. M., and subject children.
The first issue this court had to address is whether the 911 tape was legally “sealed” pursuant to the operation of CPL 160.50 (1) (c), which states in pertinent part, “all official records and papers . . . relating to the arrest or prosecution, including all duplicates and copies thereof, on file with the division of criminal justice services, any court, police agency, or prosecutor’s office shall be sealed and not made available to any person or public or private agency.”
While ACS argues that 911 tapes are different than other criminal court related documents, that distinction does not change the importance of enforcing the public policy behind the sealing statute in a case that is terminated favorably to the accused. The Court of Appeals has found that the legislature’s
*355 “purpose in adding these provisions to the Criminal Procedure Law and the Human Rights Law was to ensure that the protections provided to exonerated accuseds be ‘consistent with the presumption of innocence, which simply means that no individual should suffer adverse consequences merely on the basis of an accusation, unless the charges were ultimately sustained in a court of law.’ ” (Matter of Joseph M. [New York City Bd. of Educ.], 82 NY2d 128, 131 [1993], quoting Governor’s Approval Mem, 1976 McKinney’s Session Laws of NY at 2451.)
While the CPL refers to “official records and papers,” case law has applied the statute to audio and video recordings as well. In Matter of Dondi, the Court of Appeals held that the “broad and inclusive statement [contained in CPL 160.50] should be read to include a tape recording that was integral to both appellant’s arrest and his prosecution.” (63 NY2d 331, 337-338 [1984].) The Second Department applied Dondi in Matter of Catterson v Corso where it held that “all audio and videocassette tapes made in connection with the criminal action” fell “within the scope of ‘official records and papers’ and were therefore properly sealed.” (244 AD2d 407, 407-408 [1997].) It is clear that 911 tapes are kept “on file” with “a police agency.” Therefore, the 911 tape at issue here fits both the dictates of Dondi and the statutory language precisely and consequently was sealed when the criminal case was dismissed. While the Court of Appeals decision in Matter of Hynes v Karassik (47 NY2d 659 [1979]), ruled that the audiotapes at issue (which were not 911 tapes) were not sealed as part of the criminal case, the Court has reconciled these cases in its subsequent holding in Matter of Harper v Angiolillo (89 NY2d 761 [1997]). In Harper, the Court stated that “bright line rules are not wholly appropriate” in the area of what constitutes “official records,” and that, “while some recordings may qualify as an official record under certain circumstances, not all tape recordings will qualify as an official record in every case.” (Id. at 766.) Since the Court of Appeals case law does not provide any further guidance for making this determination, this court is relying on the language in Dondi and Catterson in making this ruling. The court finds that this holding will serve the purpose of CPL 160.60 which states that an arrest in a case that was terminated in favor of an accused “shall be deemed a nullity and the accused shall be restored, in contemplation of law, to the status he occupied before the arrest and prosecution.”
*356 The petitioner’s case at trial consisted primarily of statements allegedly made by the two teenage subject children to the ACS caseworker, admitted pursuant to Family Court Act § 1046 (a) (vi). The respondent’s case, in contrast, consisted of his firsthand account of the event. The court found the respondent to be a credible witness as to both the incident itself and the events leading up to it. Those preceding events shed light on the incident itself and place it in a different context than that presented by the petitioner.
Caseworker R. testified that, when she went to the home on April 6th, she interviewed each child privately in a separate room. According to Carolina, who was 16 at the time, the incident began when her father came home and she went to pick up a cup that had been left on the floor. Carolina told the caseworker that her father kicked the cup and that she then pushed the respondent father which caused him to grab her arms in response. This resulted in her mother and Lisbeth grabbing the respondent father. Ms. M. then pushed the respondent father off of Carolina and they ran into the other room. Carolina said her mother’s finger got caught in the door when they closed it to block the respondent from entering. Carolina never said the respondent hit either her or her sister or scratched their mother. Carolina admitted to the caseworker that she had not been getting along well with her father because she was not doing well in school and was in counseling in school because of conflicts there. Carolina said that the way her father usually disciplines her is to take away privileges and talk to her. Carolina also stated to the caseworker that she felt her father favored Lisbeth over her. As to any prior domestic violence, Carolina said her parents mainly have verbal arguments and she had never seen any physical fights between them.
Lisbeth, who was 17 years old at the time of the incident, told the caseworker a variation of the same story—that her stepfather was annoyed that the cup was on the floor and they had a verbal argument over who left it there. Her mother said, “if you kick the cup, I will leave you.” Lisbeth said her father was pointing his finger at C.K. and she, her sister and her mother threw themselves at Mr. K. with all of them hitting the respondent father in the back. At that point, according to Lis-beth, the respondent fought back, cursed at the two girls and put his hands around her mother’s neck but did not apply any pressure. Lisbeth, her sister and her mother then ran into another room and threatened to call the police. Lisbeth said she *357 was scared to live with the father after this incident and stated that about once per month her parents engage in a physical altercation where her father hits her mother on the arm. Lis-beth also told the caseworker that although the respondent is not her biological father, she had known him for 16 years and he treated her like a daughter. Lisbeth said she loves the respondent, they have a good relationship, he has never harmed her and she has never had a physical altercation with him. The caseworker learned from the children that neither had any marks from the incident nor were they in need of medical treatment. She did observe a 2V2-inch scratch on the mother’s arm.
Caseworker R. testified that on April 7, 2015 she spoke to the respondent by phone and he admitted to coming home, after having dinner out and drinking four beers, and kicking the cup, at which point the mother and the girls jumped on him. He admitted having an argument with the children’s mother and cursing at the subject children but he denied any physical assault on his part. He told the caseworker that the non-respondent mother was upset because he didn’t come home from work on time and that the mother was jealous as she suspected him of having an affair. It’s worth noting that on a subsequent visit to the home only two weeks later, the caseworker spoke to both of the children who wanted Mr. K. to come back home as they missed him and expressed that they were not afraid of him.
Mr. K. testified that he married Ms. M. in 2000, that they had a daughter, the subject child Carolina, and a stepdaughter, the subject child Lisbeth. When he and the children’s mother met, Lisbeth was IV2 years of age and he is the only father she’s ever known. April 5, 2015 was a Sunday, and the respondent testified that he took his wife to work at 8:00 a.m. in the car and then went back home and went to sleep. Around noon, the girls asked him to take them to the restaurant Sizzler. The respondent testified that he told them he had no money and asked them to call their older brother, Randall, who was 30, to see if he could take them. Randall never showed up so Mr. K. decided to try to get the money for the meal the girls wanted. He left the house at 1:30 p.m. to go to the pawn shop with some jewelry. At some point while out, he called the children’s mother to say he would be 10 minutes late to pick her up from work and Ms. M. got angry right away and hung up without asking why he was running late. He then learned that Lisbeth went to pick up her mother because her mother was now angry at Mr. K. and didn’t want him to come get her. Mr. K. arrived *358 home ahead of the girls and their mother and when the three returned to the home, Ms. M. wouldn’t speak to Mr. K. and the girls didn’t seem to want to go out to the restaurant anymore. Mr. K. was understandably upset at this point and left the house to “play numbers.” While he was out, he received conflicting calls from Lisbeth—first saying she’d still like to go to Sizzler and then changing her mind because her younger sister wouldn’t go because their mother didn’t want to go. Lisbeth apologized to her stepfather at that point, but feeling frustrated by the whole situation, Mr. K. testified that he chose to go to his friend’s house and ended up going out with them and their child to Chuck E. Cheese. After being gone for approximately four hours, Mr. K. arrived home around 8:00 or 9:00 p.m. He then went to heat up some food in the microwave when he saw the soda cup with juice on the floor in the living room.
This backdrop to the incident is significant to the court because it provides a credible basis for the mind-set of Mr. K., his wife and his daughters that likely contributed to the “cup on the floor” incident getting out of hand. Mr. K. was attempting to do something nice for the children and yet his efforts led to a series of misunderstandings and ultimately were for naught. It is understandable that this would have led to feelings of frustration and anger on his part. Given Mr. K.’s testimony that his wife could be jealous, she may well have been suspicious and angry as well by the time he got home since she didn’t know where he was for several hours and this concern may have been shared by the girls as well.
Mr. K.’s version of how the incident began was similar to the children’s. After both girls denied leaving the cup on the floor, he tried to kick the cup and subsequently his wife and the girls jumped on him and started hitting him. Mr. K. testified he attempted to stop them and defend himself by putting his arms around all of them at the waist and putting them on the chair. They then ran into the other room and pushed the door closed as he was trying to get in. When they threatened to call the police, Mr. K. left. Approximately 20 minutes later, his wife called him to say the police were at the home and would put out a warrant for him if he didn’t return. Mr. K. then went back home and was arrested, though the case was later dismissed. The respondent testified that he didn’t intentionally scratch his wife and didn’t know how she got the scratch on her arm. Furthermore, Mr. K. was adamant that he never intentionally hurt his wife and did not use force to discipline his children. *359 Mr. K. has had no prior domestic incident, police or ACS reports.
The subject children’s statements are generally consistent with the respondent’s testimony and all three agree on the most salient fact—that it was Carolina who initiated the aggressive physical contact, not the respondent father.
In this child protective proceeding, in order to establish neglect based on domestic conflict, ACS must prove by a preponderance of the evidence (1) that the child’s physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired, and (2) that the actual or threatened harm to the child is a consequence of the failure of the parent or caretaker to exercise a minimum degree of care in providing the subject child with proper supervision or guardianship. (See Family Ct Act §§ 1012 [f] [i] [B]; 1046 [b] [i]; Matter of Afton C. [James C.], 17 NY3d 1 [2011]; [Matter of Kiana M.-M. [Robert M.], 123 AD3d 720, 721 [2d Dept 2014].) The Court of Appeals has held that imminent danger “must be near or impending, not merely possible.” (Nicholson v Scoppetta, 3 NY3d 357, 369 [2004].) For this court to make a finding of neglect, there must be harm or potential harm to the child, not just “undesirable parental behavior.” (Nicholson at 369; Matter of Kiana at 721.)
Here, there is no clear proof that the children were impaired or in imminent danger of impairment as a result of this single incident. (See Nicholson at 375 [“Not every child exposed to domestic violence is at risk of impairment”]; see also Matter of Chaim R. [Keturah Ponce R.], 94 AD3d 1127, 1130 [2d Dept 2012]; Matter of Harper F.-L. [Gary L.], 125 AD3d 652, 655 [2d Dept 2015]; Matter of Larry O., 13 AD3d 633, 633 [2d Dept 2004].) The fact that a child may express upset or fear of a parent, even for a few days, after a family dispute occurs is not a sufficient basis to conclude that impairment has occurred. Moreover, the subject children involved in this case are teenagers, aged 16 and 17 at the time of the incident, and their actions precipitated the events that occurred. Even if Mr. K.’s response to having both teens and their mother jump on him was excessive given his relative size and strength, that response is not sufficient for a finding of neglect in this case.
In the Matter of Luke M. (193 AD2d 446 [1st Dept 1993]), the First Department upheld the Family Court’s refusal to find that Luke was a “neglected child” as defined by Family Court Act § 1012 (f) (i) (B), based upon an isolated incident of exces *360 sive force by the respondent. In reaching this holding, the Appellate Division stated that
“while we certainly do not condone the respondent’s conduct, we find no compelling basis to reverse that determination. There was insufficient evidence to require our finding that Luke’s ‘physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired’ solely as a result of the above-described incident.” (Matter of Luke M., 193 AD2d 446, 447 [1st Dept 1993] [citation omitted]; see also Matter of Christian O., 51 AD3d 402, 403 [1st Dept 2008] [“This appears to have been an isolated incident, and ‘(w)hile losing one’s temper does not excuse striking and injuring one’s child, one such event does not necessarily establish . . . neglect’”], quoting Matter of P. Children, 272 AD2d 211, 212 [2000], lv denied 95 NY2d 770 [2000]; see also Matter of Amanda E., 279 AD2d 917, 919 [3d Dept 2001] [“Given (the subject child’s) age, the circumstances under which the altercation occurred and the isolated nature of the father’s admittedly inappropriate conduct, we cannot say that Family Court erred in dismissing the subject petitions”].)
The fact that the respondent may have been under the influence of alcohol at that time is also not sufficient in and of itself for a neglect finding. To base neglect upon alcohol use, the court must find that “[he] misus[ed] alcoholic beverages to the extent that he los[t] self-control of his actions.” (Family Ct Act § 1012 [f] [i] [B].) The fact the respondent did not continue to try to gain access to the mother and children after they closed the bedroom door behind them but instead left the house to cool-off shows that he did not lose control as required by the statute.
After having reviewed this evidence as well as having had the unique opportunity to assess the credibility of the respondent father, the court holds that the proof is insufficient to make a finding of neglect by a preponderance of the evidence and the petition is therefore dismissed.