OPINION OF THE COURT
Jacqueline B. Deane, J.
This court held a hearing pursuant to Family Court Act § 1028 on this abuse petition which involves allegations of burns to the four-year-old subject child Vinny which he received while in the care of his parents who are both named as respondents. The application for return of both subject children from foster care was made by the respondent mother by motion filed on March 30, 2017 and joined in by the respondent father. At the conclusion of the 1028 hearing, the Attorney for the Children (AFC) also argued in favor of the children’s return to the care and custody of their parents.
The Administration for Children’s Services (ACS or petitioner) filed this petition on September 19, 2016, later amended on October 5, and sought removal of both subject children after a doctor at Maimonides Hospital determined that Vinny’s injuries were not consistent with his mother’s explanation for how they occurred. Vinny was transferred from Maimonides to Staten Island Hospital because he needed treatment from that hospital’s specialized burn unit. The doctor at Staten Island Hospital informed the ACS caseworker that he did not suspect abuse. Although the matter was investigated by New York Police Department (NYPD) detectives, no criminal charges were brought. The children have resided with their paternal great aunt and adult cousin since the time of the initial removal, over six months ago.
At the hearing, this court heard the testimony of Ms. F., an ACS caseworker, and Dr. Ingrid Walker-Descartes, a child abuse specialist from Maimonides Hospital. In addition, each of the respondent parents testified on their own behalf. ACS and the respondents introduced several exhibits into evidence, *476 including records from both hospitals, which the court has carefully reviewed.
The sole basis for the removal of the children proffered by petitioner’s witnesses at this hearing is the four-year-old subject child Vinny’s injuries. The petition refers to two different types of injuries: burns on Vinny’s hands and back and small healed abrasions/marks on his knuckles and other parts of his body. The evidence established that both respondents and the child Vinny himself have consistently given the same explanations for those injuries to multiple people including ACS caseworkers, the NYPD detectives and various medical providers at the two hospitals where Vinny was treated. These explanations were testified to by all four witnesses at the hearing and repeatedly appear throughout all of the exhibits in evidence. In determining whether there would be imminent risk to the children returning home, the court is not considering the small healed marks/abrasions as they are the type of minor injuries an active four year old would be likely to sustain through normal play. In fact, the explanation given by both Vinny and his parents for these injuries is that they came from roughhousing between Vinny and his three-year-old brother who have been described by the kinship foster family as very active. (See respondent mother’s exhibit E, ACS Progress Notes at 56.) In any event, marks of this nature do not indicate a risk to the child’s life or health as required to continue the removal pursuant to Family Court Act § 1028. Therefore, the court will focus its discussion of the evidence surrounding Vinny’s burns.
According to the account Ms. Z. repeatedly gave in her sworn testimony, to her husband and to anyone else who asked, she was cleaning up the kitchen when she told Vinny to take a shower. This was something that the whole family agrees Vinny had been doing alone when he lived with his grandparents in China and which his father had also taught him to do when he returned to his parents’ home in June of 2016. While Vinny was in the bathroom, the respondent mother heard him screaming and she ran in to see what was wrong. She found Vinny in the tub with the water still running. She quickly turned off the water and picked Vinny up and immediately saw that his left hand was very red. Vinny was screaming and crying and Ms. Z. dried him off and got him dressed. She then put ointment on the burn and called Vinny’s father who was in Maryland at the time. Mr. Z. told his wife to wait to take Vinny to the hospital until he returned home first thing in the morn *477 ing. Both parents expressed fear of taking Vinny to the hospital because they had heard ACS takes away children who are injured. The mother stayed by Vinny’s bedside all night applying ointment to the burn periodically. When the father returned Saturday morning, he purchased burn cream at a pharmacy and applied that cream to the burn. While the parents seemed to believe the burn was healing Saturday, by Sunday morning it had clearly gotten worse so the respondent father took Vinny to Maimonides which ultimately resulted in the call to ACS and Vinny being transferred to Staten Island Hospital burn unit.
Dr. Walker-Descartes testified that she did not examine Vinny personally nor did she meet with his father. Rather she was electronically sent photographs of his burns which the treating doctor requested she examine as the hospital’s child abuse specialist. Dr. Walker-Descartes described three burns on Vinny: the most serious being to the top of the left hand, a small circular one to the right side of Vinny’s back and a mild burn to the top of Vinny’s right hand. Dr. Walker-Descartes found the burns suspicious because of the demarcation of the burn on his left hand and the lack of splash marks. Through both testimony and documentary evidence, the bathtub was described as having a single faucet head with one lever to adjust the temperature going from left to right. Since Vinny took showers, not baths, the water would, in theory, go directly down the drain when turned on and not pool in the tub. Vinny had been taught to turn on the water with one hand and put the other hand, in this case his left, under the faucet to check the temperature. Vinny described himself as squatting in the tub and that when the water burned his left hand, he “flinched” and his back hit the faucet and he fell back in the tub. (See respondent mother’s exhibit E, ACS Progress Notes at 35.) When Vinny was brought back to the apartment approximately one month after the incident occurred, he demonstrated how he squatted in the tub and turned the faucet but was unable to precisely reenact exactly how the incident occurred. While Dr. Walker-Descartes found this notable and significant in her assessment of the manner of injury, the court is not convinced that this is unusual. It is likely that Vinny’s first visit to his home after more than a month of removal coupled with the potentially traumatic reenactment of his injury in front of unknown authority figures would be a lot to handle for a four year old. Additionally, if the burn happened as Vinny described, *478 it was likely very quick and he would have been too distracted by the significant pain in his left hand to remember his precise body movements immediately afterwards. In fact, the detective tested the water and determined that it could reach a temperature of 140 degrees in less than one minute. (See respondent mother’s exhibit E, ACS Progress Notes at 13.) Dr. Walker-Descartes testified that a second- or third-degree burn of the type Vinny sustained could be obtained in water that hot in three to eight seconds.
As noted previously, the case records establish that the Staten Island Hospital attending physician Dr. Faliks found that the explanation given by Vinny and his mother for Vinny’s burns “is consistent but very odd” and that “he does not suspect any type of abuse.” (See respondent mother’s exhibit E, ACS Progress Notes at 9.) ACS has adopted Dr. Walker-Descartes’s opinion that the burns are inconsistent with this explanation in light of her expertise as a pediatrician and child abuse expert. The respondents argue that the opinion of Dr. Faliks, though he is not a child abuse expert, is equally if not more valid given his specialized knowledge of burns and the fact that he actually examined Vinny’s burns in person. This dispute among the experts will likely be the focus of the fact-finding hearing in this case.[1] However, the court does not believe it is necessary to fully resolve the question of how Vin-ny’s injury occurred to address the legal issue at this 1028 hearing.
Family Court Act § 1028 (a) states, in relevant part:
“Upon the application of the parent . . . of a child temporarily removed under this part . . . the court shall hold a hearing to determine whether the child should be returned . . . Upon such hearing, the court shall grant the application, unless it finds that the return presents an imminent risk to the *479 child’s life or health.”
The Court of Appeals ruling in Nicholson requires this court to
“weigh, in the factual setting before it, whether the imminent risk to the child can be mitigated by reasonable efforts to avoid removal. It must balance that risk against the harm removal might bring, and it must determine factually which course is in the child’s best interests. Additionally, the court must specifically consider whether imminent risk to the child might be eliminated by other means, such as issuing a temporary order of protection or providing services to the victim.” (Nicholson v Scoppetta, 3 NY3d 357, 378-379 [2004].)
It is essential to analyze the facts of this case in the context of this particular family’s culture and history. First, although the children in this case are ages three and four, the parents are, as stated by the AFC, essentially new parents to them. Both children were sent to China to live with their grandparents when each was approximately six months old, which an adult cousin informed the caseworker is a common occurrence in Chinese culture to enable parents to earn more money. The subject children had only returned to the United States in June 2016, a mere three months before this incident occurred. To complicate matters, the boys had been with different sets of grandparents, and, as a result, did not have any real sibling relationship until they came to live with their parents. Furthermore, the parents have had to adjust to having two very active toddlers who, according to the report of their cousin who resides in the children’s foster home, had not been given much structure in their prior home in China.[2] This means that not only were the children acclimating to a totally new culture and different parenting and expectations but the whole family was acclimating to each other. Although the father initially remained at home with his wife to care for the boys, by July he had returned to working in Maryland and was away from home for six days each week. This meant that the children’s mother was essentially a single parent still adjusting to the care of these two small boys and trying to navigate American cultural and legal norms around parenting. Specifically, the parents *480 both testified to being under the misapprehension that ACS would consider it inappropriate for a mother to bathe her son even at age four. They also believed that the ability to bathe oneself is the kind of independence that would be expected for a child to attend school as Vinny would be doing within the next year. While both of these were mistaken assumptions about American parenting norms and expectations, the court credits that these beliefs were sincerely held by the parents and led to some of the poor decision-making which likely resulted in Vinny’s injury.
Both the parents and their children’s primary language is Mandarin. As a result, all interviews with the family have been conducted through interpreters, sometimes in person and sometimes via phone using a language line interpretation service. Both parents testified in court through the use of an official court interpreter. This circumstance had at least two consequences that were noted by the court: First, it makes the assessment of credibility somewhat more difficult since the court was unable to understand their direct testimony in the language used by the parents. Second, some of the words used by the witnesses in Mandarin do not lend themselves to easy or direct translation to English. This is not due to the lack of skill by the court interpreter but rather is due to the inherent differences in these two languages. Fortunately, because one of the attorneys for the respondent mother is a Mandarin speaker, he was able to bring this issue to the court’s attention. One example was the translation of a word used by the subject child Vinny to describe how his injury occurred. The interpreter initially offered the translation of the word as “carelessly,” which is not a word in English typically used by a four-year-old child. However, once defense counsel raised the issue, the interpreter clarified that the word does not lend itself to a simple one-word translation in English, but is more akin to the phrase “without purpose,” and that such would be a word a four-year-old Mandarin speaker might naturally use. Subtle issues of word choice and expressions are often key to credibility assessments not only by courts but by medical providers and law enforcement. Given that there is a difference in opinion among those professionals in this case, the court believes it is appropriate to consider the fact that the language difference is likely to have made an accurate assessment more challenging for the investigators.
Despite the language barrier, the court did find both parents to be credible, most certainly in their love and devotion to their *481 children and in their regret related to the injury Vinny sustained. It was clear that both mother and father felt sincere remorse in having delayed taking Vinny to the hospital and thereby causing him any prolonged pain and risk of increasing the seriousness of his injury. It was also clear that they both had a sincere fear of ACS and other law enforcement based on experiences in the immigrant community, some for legitimate reasons and some exaggerated by the media or the rumor mill. Both parents have now attended and completed parenting skills classes. Through those classes, as well as ACS’s and this court’s involvement in their lives, the respondent parents have been educated in American parenting expectations. This is key to the court’s analysis of the degree of risk to the children if they are now returned to their parents. While the court is not making any finding as to how Vinny’s burns occurred, the court finds that the risks that existed at the time of the filing of this case have been significantly mitigated by that education as well as by the fact that the father is willing to remain home with the mother for the foreseeable future. Having the assistance and support of a second parent is notably different from being alone full time with two young children six days per week.
Since the time this petition was filed over six months ago, both respondents have been fully cooperative with ACS, the foster care agency, and all service referrals. (See respondents’ exhibits A, B.) Both parents have completed parenting skills programs and have been attending individual therapy regularly. Since the children have been residing with a relative, the parents have been granted liberal full day visits supervised in the foster home and the mother in particular has taken advantage of this order by visiting almost every day. No safety concerns have been raised about the parents’ interactions with their children during any of these visits over this more-than-six-month period. Nor has either child been observed to have any fear of their parents, including when the caseworker observed Vinny with his mother in the hospital the day after he was admitted. The court allowed some unsupervised visits during the course of this hearing and those, too, were positive. An ACS court report dated April 13, 2017 stated that the children expressed that they had fun during the unsupervised time with their parents, that on April 10, the caseworker observed the interaction between the parents and children to be “warm and caring,” that “[b]oth parents were attentive to *482 the needs of the children,” that the “children appeared comfortable in the presence of their parents,” and that the foster parent “did not express any concerns regarding the visits.” (See ACS court report, dated Apr. 13, 2017.)
The court must consider whether any orders can be put in place to eliminate or mitigate any risk that might currently exist and allow the boys to return home to their parents so they can resume the process of acclimating to being a family here in the United States. Given the respondents’ high degree of cooperation with ACS over the past six months and compliance with all prior orders of this court, this court is convinced that both parents will continue to obey court orders, including one that for now will not allow the mother to be home alone with the children for any significant amount of time. The court finds that the orders set forth below will be sufficient under Nicholson to mitigate any risk of returning the subject children that might exist.
Thus, for the reasons above, the respondent parents’ application pursuant to Family Court Act § 1028 is granted.
The court hereby orders that the subject children be released back to the legal care and custody of their father and mother under the following conditions:
Both parents are to cooperate with ACS supervision including weekly announced and unannounced home visits.
The respondent father is not to leave the respondent mother alone with the subject children for more than one hour at a time.
Both respondents are to continue to attend their individual counseling sessions regularly as long as recommended by the provider.
One parent must be present in the bathroom at all times while either child is bathing.
Neither parent is to use any corporal punishment on the subject children.

. The court notes that even when abuse is found at a fact-finding hearing, that finding is not necessarily dispositive of whether the children should be released to the respondent(s) or not. (See Matter of Philip M., 82 NY2d 238, 243 [1993] [after making finding of abuse, court released the subject children to the respondents with supervision]; see also Matter of Maria S. [Samantha S.], 43 Misc 3d 1218[A], 2014 NY Slip Op 50690[U], *39 [Fam Ct, Kings County 2014, Wan, J.] [Family Court held consolidated 1028/fact-finding hearing, made abuse finding while granting 1028 application because “respondents ha(d) done everything that the agency ha(d) asked them to do and they ha(d) cooperated with every single court order. Their unsupervised visitation with the children ha(d) gone without incident or concern for over three months”].)

. The cousin stated “that when the children were in China they were very spoiled and are not used to follow [ing] rules.” (Respondent mother’s exhibit E, ACS Progress Notes at 56.)