Matter of Aerobella T. (Bartolomeo V.) (2019 NY Slip Op 02396)





Matter of Aerobella T. (Bartolomeo V.)


2019 NY Slip Op 02396


Decided on March 28, 2019


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: March 28, 2019

525981

[*1]In the Matter of AEROBELLA T. and Others, Alleged to be Neglected Children. SULLIVAN COUNTY DEPARTMENT OF FAMILY SERVICES, Respondent; BARTOLOMEO., Appellant. (And Another Related Proceeding.)

Calendar Date: February 14, 2019

Before: Clark, J.P., Mulvey, Aarons, Rumsey and Pritzker, JJ.


Michelle I. Rosien, Philmont, for appellant.
Alexandra Bourne, Sullivan County Department of Family Services, for Sullivan County Department of Family Services, respondent.
Cliff Gordon, Monticello, for Florije U., respondent.
Michael C. Ross, Bloomingburg, attorney for the children.



MEMORANDUM AND ORDER
Clark, J.P.
Appeal from an order of the Family Court of Sullivan County (Savona, J.), entered November 29, 2017, which granted petitioner's applications, in two proceedings pursuant to Family Ct Act article 10, to adjudicate the subject children to be neglected.
Respondent Bartolomeo V. (hereinafter the father) and respondent Florije U. (hereinafter the mother) are the parents of four children — two sons (born in 2012 and 2013) and two daughters (born in 2015 and 2016). In September 2016, following an August 7, 2016 hotline report alleging that the mother had given birth to a child who was exhibiting signs of drug withdrawal and an August 29, 2016 incident in which the children were left unsupervised in allegedly unsanitary and/or dangerous conditions while respondents slept, petitioner filed separate neglect petitions against respondents. Following a fact-finding hearing, Family Court adjudicated the children to be neglected, and respondents thereafter consented to a dispositional order placing the children in foster care under the supervision of petitioner. Only the father appeals, contesting Family Court's finding that he neglected the children.
As relevant here, to establish neglect, petitioner bore the burden of demonstrating, by a preponderance of the evidence (see Family Ct Act § 1046 [b] [i]), that the children's physical, mental or emotional conditions had been impaired or were in imminent danger of becoming [*2]impaired as a result of the father's failure "to exercise a minimum degree of care in providing the child[ren] with proper supervision or guardianship" (Nicholson v Scoppetta, 3 NY3d 357, 368 [2004]; see Family Ct Act § 1012 [f] [i] [B]; Matter of Logan C. [John C.], 154 AD3d 1100, 1102 [2017], lv denied 30 NY3d 909 [2018]). "A finding of neglect requires only an imminent threat of injury or impairment, not actual injury or impairment, and such threat may be established through a single incident or circumstance" (Matter of Emmanuel J. [Maximus L.], 149 AD3d 1292, 1294 [2017] [citations omitted]; see Matter of Paige AA. [Anthony AA.], 85 AD3d 1213, 1215-1216 [2011], lv denied 17 NY3d 708 [2011]). The test of whether a parent has failed to exercise a minimum degree of care is an objective one, focused on "whether 'a reasonable and prudent parent [would] have so acted, or failed to act, under the circumstances'" (Matter of Afton C. [James C.], 17 NY3d 1, 9 [2011], quoting Nicholson v Scoppetta, 3 NY3d at 370). We accord great deference to Family Court's findings and credibility determinations and, so long as they are supported by a sound and substantial basis in the record, we will not disturb them (see Matter of Johnathan Q. [James Q.], 166 AD3d 1417, 1418 [2018]; Matter of Hailey XX. [Angel XX.], 127 AD3d 1266, 1268 [2015]).
The evidence presented by petitioner at the fact-finding hearing established that Georgia Harris, one of petitioner's caseworkers, arrived at the hospital on August 7, 2016 in response to the hotline report regarding the mother's drug use during her pregnancy with the youngest child. Harris testified that, upon arriving at the mother's hospital room, she discovered that the father had left three of the children alone with the mother, who had given birth only hours earlier. Harris stated that the father returned roughly 15 minutes later and that she temporarily removed the children from respondents' care, based in part on the father's failure to identify a plan for the three oldest children during the mother's hospital stay. Harris testified that she thereafter brought the three oldest children to her office, where she observed that the two boys were not wearing underwear, had dirty feet and were wearing shoes that were too small and on the wrong feet. She also stated that she observed "red blotches . . . and some scratches" on the girl and that, when asked where the marks came from, one of the boys stated that the father "hits her." Harris further stated that a "foul odor" emanated from the children and that she observed bug bites on their legs.
As established by the record, in the days or weeks that followed, the children were returned to respondents under the supervision of petitioner and, among other conditions, the father was directed by court order to ensure that the mother did not have any unsupervised contact with the youngest child. A prevention services caseworker for petitioner and a clinical caseworker at Access: Supports for Living each testified that, on August 29, 2016, they arrived at respondents' home for a scheduled home visit and encountered an increasingly alarming situation. The caseworkers reported that they could hear the children inside the house but could not get anyone to answer the door. Despite prolonged knocking and a phone call to respondents, the caseworkers could not gain entry to the home for over 40 minutes. During this time, one of the children told the caseworkers through the door that he could not wake his parents. The caseworkers stated that they thereafter sought police assistance due to their concerns for the welfare of the children.
The state trooper who responded was ultimately able to force entry into the home through a back door that led directly into a bedroom where the three oldest children were confined by a makeshift half door that separated them from respondents' bedroom. The state trooper stated that he found respondents sound asleep, despite the commotion of his entrance, and that he yelled repeatedly to try to wake them up. It was not until the trooper tapped on the father's feet several times that the father finally awoke. The caseworkers and the state trooper all testified that, upon gaining entry to the home, they immediately located the three oldest children, one of whom was completely naked and another of whom was naked from the waist down. All three of the children were covered in a white substance — later determined to be diaper cream — with the youngest having it in her mouth. The caseworkers were initially concerned about the location of the fourth child, an infant, whom they located alone in a separate room. The three-week old infant was in a bassinet with a bottle and covered by several loose blankets, creating a substantial risk to her.
Testimony and photographic evidence submitted by petitioner further demonstrated that respondents' home was in an overall unsanitary condition. The caseworkers each testified that a training toilet containing feces was on the floor in the room where the three oldest children had been confined and that feces was also smeared on the floor of that room. They further stated that the two mattresses in the bedroom were heavily soiled and stained and were not covered by sheets, although there was some bedding on the floor near the beds. The trooper testified to walking through food strewn on the floor in respondents' bedroom.
The father denied the allegations and testified on his own behalf. Although some of his testimony was consistent with that given by petitioner's witnesses, the father offered a starkly different account of the conditions of the children and the home prior to him lying down for a nap that afternoon. He further offered explanations as to the surrounding events that Family Court ultimately found implausible.
Family Court found, among other things, that the home provided for the children by the father was in a "deplorable, unsanitary condition[], with food strewn throughout the home, feces on the floor, and visibly soiled and stained mattresses provided for the children" and that the father failed to provide proper supervision or guardianship to the children "when he was unable to be awoken, for an extended period of time, in spite of people pounding on the door, the children yelling and trying to rouse [him], a phone call being placed to [him], and a police officer forcefully entering the home." These findings have a sound and substantial basis in the record and support Family Court's further conclusion that the physical, mental and emotional conditions of these young children were both impaired and placed at risk of imminent impairment by the father's failure to exercise a minimum degree of parental care in providing them with proper supervision or guardianship (see Matter of Johnathan Q. [James Q.], 166 AD3d at 1418-1419; Matter of Ahriiyah VV. [Rebecca VV.], 160 AD3d 1140, 1142 [2018], lv denied 31 NY3d 911 [2018]; compare Matter of I.A. [Devona H.], 132 AD3d 757, 758 [2015]; Matter of Javan W. [Aba W.], 124 AD3d 1091, 1092-1093 [2015], lv denied 26 NY3d 905 [2015]). Accordingly, as Family Court's determination of neglect is supported by a sound and substantial basis in the record, we discern no basis upon which to disturb it.
Mulvey, Aarons, Rumsey and Pritzker, JJ., concur.
ORDERED that the order is affirmed, without costs.