Matter of Tyler Y. (Katrina Y.) (2022 NY Slip Op 01081)





Matter of Tyler Y. (Katrina Y.)


2022 NY Slip Op 01081


Decided on February 17, 2022


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:February 17, 2022

532788
[*1]In the Matter of Tyler Y. and Others, Alleged to be Neglected Children. Schoharie County Department of Social Services, Petitioner; Katrina Y., Appellant.

Calendar Date:January 12, 2022

Before:Lynch, J.P., Clark, Aarons and Reynolds Fitzgerald, JJ.

Veronica Reed, Schenectady, for appellant.
Teresa Meade, Middleburgh, attorney for the child.
Mark J. Gaylord, Schenectady, attorney for the children.



Lynch, J.P.
Appeal from an order of the Family Court of Schoharie County (Bartlett III, J.), entered January 26, 2021, which, in a proceeding pursuant to Family Ct Act article 10, denied respondent's application for return of one of the subject children.
Respondent is the mother of five children (born in 2003, 2004, 2008, 2020 and 2021).[FN1] After the child born in July 2020 (hereinafter the child) presented to Albany Medical Center on September 17, 2020 with a fractured left femur and bruises on his head, petitioner effectuated an emergency removal of the child from respondent's care (see Family Ct Act § 1024). The next day, petitioner filed a neglect petition against respondent pertaining to the child and his three older siblings, alleging that the child's father had "used excessive force while removing [the child's] clothing, causing an impacted, mildly displaced fracture of the proximal left femur." The petition also referenced the child's bruises and alleged that respondent "knew or should have known [that the father] was an unsafe caretaker."[FN2] A skeletal survey taken at the hospital revealed that the child also had eight rib fractures.
On December 22, 2020, respondent filed an application for the return of the child pursuant to Family Ct Act § 1028, contending that his placement in foster care was not in his best interests and, as asserted by respondent's counsel, the child's alleged injuries "do not exist as pled by [petitioner]." Following a prompt hearing, initiated on December 29, 2020 and completed on January 4, 2021, Family Court denied respondent's application, finding that "the explanations given by . . . respondent [as to the cause of the injuries] . . . were not plausible or consistent with the actual injuries" and "the return [of the child] would be contrary to [his] best interest[s]." The court also found that "imminent risk to the [child] would not be eliminated by the issuance of a [t]emporary [o]rder of [p]rotection directing the removal of either parent from the home" and that "[t]here have been reasonable efforts [made to avoid continued removal] to the extent possible," including mental health counseling for respondent, supervised visitation and recommendations for parenting classes. Respondent appeals, arguing that petitioner failed to establish imminent risk to the child that would warrant his continued placement in foster care.[FN3]
Upon an application for a child's return pursuant Family Ct Act § 1028, Family Court must "hold a hearing to determine whether the child should be returned" and, upon such a hearing, "grant the application, unless it finds that the return presents an imminent risk to the child's life or health" (Family Ct Act § 1028 [a]). In undertaking this analysis, the court must balance "'the imminent risk with the best interests of the child and, where appropriate, the reasonable efforts made to avoid removal or continuing removal'" (Matter of Renezmae X. [Kimberly X.], 161 AD3d 1247, 1248 [2018], lv dismissed [*2]31 NY3d 1140 [2018], quoting Nicholson v Scoppetta, 3 NY3d 357, 380 [2004]). The court's resolution of such an application will only be disturbed if it lacks a sound and substantial basis in the record (see Matter of Renezmae X. [Kimberly X.], 161 AD3d at 1248; Matter of Audrey L. [Marina L.], 147 AD3d 838, 839-840 [2017]; Matter of Julissia B. [Navasia J.], 128 AD3d 690, 691 [2015]).
During the hearing, respondent testified that she believed the child's femur fracture occurred on September 14, 2020 when he was receiving immunizations at a pediatric appointment. The father had taken the child to the pediatrician on that date, while respondent stayed in the truck pursuant to the pediatrician's COVID-19 restrictions. When the father returned with the child, the father told respondent that he heard a "pop" during the administration of one of the shots and respondent observed the child to be "fussy," which she attributed to the child having received his immunizations.
Respondent testified that she became concerned about the child's leg the next day because he "wasn't moving it as actively as he normally did." After respondent left for work, she received a call from the father informing her that he had removed the child's pants to change him and "his leg flopped to the bed." Upon calling the pediatrician, the father was told to give the child Tylenol and, according to respondent, the child initially appeared to respond well to the medication. However, when respondent was changing his diaper the next morning, she realized that his leg was "swollen and . . . hard." The father then took the child to the pediatrician to be evaluated and the pediatrician informed him that he suspected a dislocated hip or broken leg. The child was ultimately transported to Albany Medical Center, where he was diagnosed with a fracture of the left femur.
During the child's hospitalization, a skeletal survey was performed and respondent learned that the child also had eight rib fractures. At the hearing, respondent was adamant that she "[a]bsolutely [did] not" believe that the father caused the femur injury, despite being told that his explanation regarding the immunizations was not probable, and claimed that she did not know how the rib fractures occurred. Respondent also testified that the bruises on the child's head resulted from him "headbutting" people while being held, noting that he did not have good head control.[FN4] During the second day of the fact-finding hearing, respondent revealed that the father had reminded her that his car had been rear-ended while returning from one of the child's pediatrician appointments in September 2020 prior to his hospitalization. When asked whether respondent believed the accident was a possible cause of the injuries, she responded, "I do not know." With respect to the child's best interests, respondent noted that the child was enrolled in day care upon being placed in foster care and an incident had occurred in which one [*3]of the day care workers tripped while holding him. She also complained that the child's baby formula had been changed during the foster care placement without notice to her. Respondent testified that she "would do anything to protect" the child if he were returned to her care.
The father's testimony was largely consistent with respondent's. He believed that the child's femur fracture happened when he received his immunizations, revealing that he heard a "pop" when the third immunization was administered to the child's left thigh. The father maintained that, when he asked the nurse about the noise, she "explained [that] it was probably the needle breaking the muscle, and it was nothing to worry about." The father acknowledged that he told an investigator that, the morning of the immunizations, he had used "a little more" force to take the child's pants off to change his diaper because his pants were tight. However, he adamantly denied having injured the child through excessive force. Like respondent, the father also believed that the child received the bruise on his head from a headbutting incident, explaining that he had previously noticed bruises on the child's head after similar events. As for the rib fractures, the father revealed that the child had been admitted to the hospital's neonatal intensive care unit (hereinafter NICU) after his birth and claimed that doctors performed CPR on him while there because he stopped breathing, averring that the rib fractures were caused by the CPR administration.[FN5]
Terri Borst, a child protective investigator for petitioner, testified that she visited the child when he was in the hospital for the femur fracture and noticed "small linear scratches" on his face — one of which went across his eyebrow and one of which was closer to his nose. These scratches are clearly visible on the photographs received in evidence. She also noticed a "yellowish green" bruise "about a centimeter in diameter" near his left temple, as well as a bruise on his right forehead directly over the eye. Borst spoke with the child's treatment providers, who characterized the femur and rib fractures as "acute," meaning that they were "new fracture[s] [occurring] within the last two weeks." As for the child's bruising, Borst described them as "sentinel injur[ies], which [are] injur[ies] that [are] minor on [their] face, but major with regard to [their] significance," noting that the child was only two months old, was not mobile and that "it would be a very rare occurrence that [he] could have inflicted the [bruises] upon hi[m]self."
Borst, who interviewed the father about the child's femur fracture, noted that he originally stated that he heard a "pop" when the child was getting his immunizations. During a subsequent conversation, however, the father informed Borst that "he had returned to the residence with the [child] after dropping [respondent] off from work, and during a diaper change he had heard a pop in the child's [*4]left leg." In that respect, the father indicated to Borst that he had struggled with removing the child's clothing during the diaper change and that he believed the fracture "beg[an] at the doctor's office during the immunizations, and he completed the injury during the struggle with the diaper change." Notably, Borst testified that, when she asked the father whether it was possible that he could have used excessive force during the diaper change, "[h]e allowed that it was possible."
Borst further noted that, upon the child presenting to Albany Medical Center with the fractured femur and bruising on his head, doctors ordered a full skeletal X ray of the child, which, Borst explained, is part of the hospital's "non-accidental trauma protocol" when "a child comes in with an injury, and the explanation for how that happened is not plausible." To that end, Borst recalled speaking with two of the child's doctors, who informed her that the explanation given by the parents "was not consistent" with the femur fracture. As for the father's explanation for the rib fractures, Borst noted that it was inconsistent with the hospital records, which she averred did not mention that "the child was ever in any form of either cardiac or respiratory arrest" or that he was "ever administered CPR" while in the NICU. She also noted that the father's explanation for the child's rib fractures — that he had received them two months prior — was inconsistent with the medical finding that they were acute injuries. Ultimately, medical staff who treated the child for his femur injury informed Borst that "these were non-accidental [injuries], [and,] given the child's age and inability to be crawling or walking, [they were] likely inflicted . . . and highly suspicious of abuse."
After petitioner rested, the parties stipulated to admitting the child's pediatric and emergency room records into evidence. A doctor's note from Cobleskill Health Center, where the child was originally evaluated before being transferred to Albany Medical Center, stated "[a]buse a possibility" as it related to the femur fracture. Moreover, a doctor's report from Albany Medical Center made diagnoses of "[c]losed [f]racture of [f]emur, [c]hild [a]buse." The skeletal survey showed the presence of multiple rib fractures, and the accompanying report stated that "the fractured femur appears to be as a result of an episode of maltreatment." In a medical note dated September 17, 2020, a forensic nurse revealed that, "when [t]he father was asked if he ever heard [the popping] noise while changing [the child]," he replied, "I've never heard it before or since" the immunizations — even though he had told Borst that he heard a popping noise while changing the child's diaper. Additionally, after an evaluation of the child in October 2020, an associate professor of pediatrics who specializes in child abuse concluded that "[t]he purported mechanism of a proximal femur fracture during routine immunizations [*5]would be highly unlikely" and that "[r]ib fractures in infants have a high specificity for inflicted trauma."
On this record, we conclude that Family Court's determination to deny respondent's motion for return of the child has a sound and substantial basis in the record. The court had evidence before it that the child presented to the hospital with serious injuries in multiple locations and that medical professionals found the parents' explanation to be implausible based upon the medical proof (see Family Ct Act § 1046 [a] [ii] ["proof of injuries sustained by a child . . . of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the care of such child shall be prima facie evidence of child abuse or neglect"]). Additionally, the father made certain inconsistent remarks regarding the circumstances surrounding the femur fracture. Family Court expressly considered whether returning the child to respondent's care with a temporary order of protection directing the father to stay away from him would mitigate the potential for further harm, finding that it would not (see Family Ct Act § 1028 [f]). The dilemma, as Family Court recognized, is that the injuries occurred "as the infant was cared for by one or the other parent at essentially all times," but neither parent offered a plausible explanation and both denied any wrongdoing. Under these circumstances, we find that Family Court's determination that returning the child to respondent's custody presented an imminent risk to his life or health has a sound and substantial basis in the record and will not be disturbed (see Matter of Chloe W. [Tara W.], 165 AD3d 681, 682 [2018]; Matter of Renezmae X. [Kimberly X.], 161 AD3d at 1248).[FN6]
Clark, Aarons and Reynolds Fitzgerald, JJ., concur.
ORDERED that the order is affirmed, without costs.



Footnotes

Footnote 1: During oral argument, counsel for respondent informed Family Court that respondent had given birth to the fifth child in December 2021.

Footnote 2: Respondent later consented to the removal, but reserved her right to have a hearing on the matter. 

Footnote 3: The attorney for the child supports Family Court's determination. However, the attorney for the three older children contends that Family Court abused its discretion by not adequately considering alternative options to the removal of the child — namely, returning him to respondent's care with an order of protection against the father prohibiting or restricting the father's contact with the child.

Footnote 4: The medical records entered into evidence establish that the child has been diagnosed with hypotonia (i.e., decreased muscle tone).

Footnote 5: The mother also testified that she was under the impression that the child had stopped breathing at one point during his stay in the NICU and that medical staff had "agitated" his chest. She noted, however, that she was informed of this information by the father, who was the parent on the phone with medical staff when they allegedly relayed this information to him.

Footnote 6: During oral argument before this Court, respondent's attorney also revealed that the child born in December 2021 has been removed from respondent's care due to the allegations against the parents regarding the subject child. Respondent's counsel also revealed that a hearing on the petition has yet to be held even though over a year has passed since the proceeding was commenced. Given the extraordinary circumstances presented, we urge Family Court to diligently progress this matter so that a final disposition may be made within a reasonable time frame. In that respect, we are mindful that petitioner did not file a brief in this appeal. Having initiated this proceeding, we remind petitioner that it is obligated to responsibly progress this matter to resolution.