Matter of NYC Admin. for Children's Servs. v M.S. (2025 NY Slip Op 51991(U))

[*1]

Matter of NYC Admin. for Children's Servs. v M.S.

2025 NY Slip Op 51991(U)

Decided on November 28, 2025

Family Court, Bronx County

Cruz, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected in part through December 17, 2025; it will not be published in the printed Official Reports.

Decided on November 28, 2025
Family Court, Bronx County

In the Matter of an Article 10 Neglect Proceeding 
 NYC Administration For Children's Services, Petitioner,

against
M.S. and W.S., Respondents. I.S. (D.O.B. XX/XX/20XX), 
 M. S. (D.O.B. XX/XX/20XX), A. S. (D.O.B. XX/XX/20XX), Child under Eighteen Years of Age Alleged to be Neglected.

Docket No. NA-XXXXX-25

Angel Cruz, J.

This memorandum decision outlines the basis for the short form order dated November 25, 2025. At issue in this Family Court Act ("FCA") § 1027 hearing is whether to grant Administration for Children Services' ("ACS") continued remand application on allegations of abuse committed against six-month baby I.S., who suffered multiple unexplained bone fractures or whether appropriate protective orders can be implemented to mitigate any risk if the subject child and his two siblings are returned to Respondents' home with supervision. 
The Court afterweighing the balance of interests finds that protective measures can be implemented as proposed by Respondent M.S. to mitigate the risk to the children upon their return to the home. Accordingly, Respondent M.S.'s FCA § 1027 application is GRANTED.

The Abuse Petition
On or about November 21, 2025, a filed verified neglect petition alleged abuse of I. S. (DOB: 
XX/XX/20XX) for unexplained broken bones and derivative abuse of A.S., and M.S., who are children less than eighteen years of age, and whose mother, Respondent M.S. (DOB: XX/XX/19XX) and Respondent Father, W.S. (DOB: XX/XX/19XX), it is alleged inflicts or allows to be inflicted upon such children physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ, in that:
A.S., M.S., and I. S. are children under the age of eighteen years whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired because of the failure of his mother, M.S. and father, W.S., to exercise a minimum degree of care in providing the child with proper supervision or guardianship; in that:
1. A.S., M.S., and I.S. are children less than eighteen years of age whose mother, M.S., and father, W.S. inflict or allow to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ, in that:
a. According to Dr. G., the child abuse specialist at New York Presbyterian Hospital, the subject child I.S. has bi-lateral humerus fractures and a clavicle fracture of the right side. In Dr. G.'s opinion, the fractures are non-accidental in nature and caused by pulling or twisting of the arms with force.
b. According to Dr. G., the clavicle fracture is showing signs of new bone growth giving an approximate age of the fracture at two weeks.
c. According to the Respondent M.S., while she was at work on November 13, 2025, the Respondent Father called her that the baby (I.S.) was crying uncontrollably and would not drink milk. When the Respondent M.S. came home from work that day, she noticed that the subject child, I.S., was not lifting his left arm so she took him to BronxCare Hospital. According to the Respondent M.S., the child had x-rays taken and per BronxCare, there were no injuries seen.
d. According to the Respondent M.S., on or about November 18, 2025, the subject child, I.S., was still acting weird and not moving his arm, so she took him to his pediatrician who recommended the child be taken to New York Presbyterian. At New York Presbyterian, a humerus facture was seen on an x-ray and a full skeletal survey was completed finding the bi-lateral humerus fractures and a clavicle fracture.
e. According to Dr. G., at New York Presbyterian, Respondent Father was continuously moving the subject child, I.S.'s arm despite being told by hospital staff that it would cause the child pain, and the child needed to remain in a swaddled position. When Respondent Father would do this, "ACS" Child Protection Specialist ("CPS") Daisy C. observed the subject child to be wailing in a high-pitched cry.
According to the Respondent Father, the baby cries all the time.
f. According to the Respondents, they are the sole caretakers of the subject child I.S., splitting parenting time based on their work schedules.
g. According to the Respondent M.S., the parents co-sleep with all three 
children in one bed. According to Dr. G., co-sleeping could not cause these 
injuries to the subject child, I.S.
2. A.S., M.S., and I.S. are children less than eighteen years of age whose mother, M.S. and father, W.S., failed to provide the subject child with adequate supervision and guardianship, in that:
a. The allegations in paragraph 1(a)-1(g) are herein re-alleged in the entirety.
Based on the foregoing, the subject children A.S., M.S., and I.S. are abused. (See verified petition dated November 19, 2025).
Emergency Removal
On November 20, 2025, ACS exercised an emergency removal. (See, FCA § 1024).[FN1]

The FCA §1027 Hearing
On November 21, 2025, at the initial appearance an immediate FCA §1027 hearing was convened to determine whether the children should remain in ACS' custody or returned to Respondent M.S. only, at the exclusion of the Respondent Father and under the supervision of a family resource with a "direct" placement. Respondent Father reserved his right to a FCA §1028 hearing and agreed to leave the one bed-room apartment during the pendency of these proceedings.[FN2]
The parties stipulated to certain facts and "framed" the hearing to which orders could be put in place to ensure the safety of the children if returned.
Stipulation of Uncontested Facts to "Frame" the 1027 Hearing
All attorneys agreed to stipulate to the following key facts:
i. the subject child is a six-month baby with unexplained injuries;
ii. the subject child sustained fractures in both upper arm bones (humeral CML fractures); and
iii. the subject child sustained one broken clavicle (collarbone) bilateral humeral classic metaphyseal lesions (CML); iv. medical experts have not identified a natural or accidental cause;
v. continued removal would cause significant hardship to both mother and child at this young age;
vi. there were no marks or bruises observed on the family's two older children (ages three and five) and there were no signs of physical abuse; vii. the family has no prior history with "ACS"; viii. on November 13 2025, Respondent M.S. noticed child in distress and takes child to BronxCare Emergency Room the next day;
ix. BronxCare ER conducts X-rays and examines the child, then discharges her;
x. several days later, when symptoms persist, Respondent M.S. follows up with pediatrician;
xi. pediatrician refers child to Weill Cornell Emergency Room; and
xii. Respondent Mother consistently followed medical advice and sought care promptly.
Investigating the Case of I.S.: Insights from Medical Experts and Family Dynamics as related to the Court by ACS CPS Ms. C.
"ACS" CPS Ms. C. testified at the FCA § 1027 hearing that a skeletal survey at New York-Presbyterian Hospital revealed healing fractures in infant I.S.'s bilateral humeral and right clavicle, which Dr. G. classified as non-accidental, caused by a twisting force. Dr. G. ruled out [*2]co-sleeping and a fall that the subject child sustained one-month prior as causes of the unexplained injuries.
According to Ms. C., a home visit revealed the family lives in a cramped one-bedroom apartment, with limited space: the king-size bed occupies most of the bedroom, with a small bureau, provides minimal walking space. The living room doubles as a daytime crib location; no room for a crib or pack-and-play. The family collectively co-sleeps for lack of crib space and prompting co-sleeping due to infant's crying. The family had no other daytime caregivers.
According to Ms. C., the Respondent M.S. denied harming her son, I.S.. Mr. W.S., Respondent Father, works nights (10 PM—6 AM). Respondent M.S. cares for the children at night and mornings until she leaves for work. She works during 9 AM—to 2:30 PM and takes the older children to school, leaving 6-month I.S. with Mr. W.S., Respondent Father. There are no additional daytime caregivers beyond Mr. W.S. and Ms. M.S., the Respondents herein. 
Respondent then called Mrs. F.K., who testified with the use of a French speaking translator. Mrs. F.K. testified that she is related by marriage: her husband is the cousin of the Respondent Father, W.S. She is 26 years old, has no children of her own and is familiar with both Respondents from their hometown in Africa.
Mrs. F.K. testified she is a student; is willing to move into the Respondent's home and supervise Respondent M.S.'s contact with her children in the home and report any wrongdoing to ASC, should that occur. Although Mrs. F.K. was not aware that I.S., the subject child, had three unexplained broken bones, she does understand that she is agreeing to not leave the room with Respondent M.S. and the children. Mrs. F.K. agreed to live with Respondent M.S. and the children indefinitely and willing to cooperate with ACS when they come to do a home visit.
Respondent M.S. also testified using a French translator, that she is the biological mother of all three (3) children.[FN3]
That she is in the best position to take care of her children because the children don't know "these other people. They only know Respondent and my husband."
Respondent M.S. testified the children are familiar with Mrs. F.K. and would be comfortable with her in the apartment. In addition, to Mrs. F.K., there are others who would supervise them including a cousin coming from Miami, and M. who was also in court. M. is a cousin, who use to live in the building and is known to the children.
Since ACS removal of the children, Respondent M.S. testified she visited the hospital "all the time," and cares for and plays with I.S., and hears his cries when she departs. When asked where does I.S. usually sleep at home? Respondent testified:
A: I.S. has his crib.
Q: And where is the crib? A: In the nighttime, we put it in the bedroom and in the daytime, it's in the living room.
Q: Does I.S. sleep all night in his crib?
A: Yes.
Q: Does I.S. ever wake up in the night? A: Yes, he wakes up.
Q: And what happens when he wakes up?
A: I get him and put him next to me while I'm breastfeeding him, and later then, I put him [*3]in his crib.
Q: If the court orders that I.S. could only sleep in his crib, would you be willing to follow that order?
A: Yes, I'm in agreement.
* * *
When asked on cross what's her understanding of why we're here today? Respondent M.S. responded: " . . . that I.S. had fractures of both arms and, uh, on one shoulder. "
Do you understand what ACS is accusing you of?
Responded said: "Yes".
Q: Did you ever intentionally harm I.S.?
A: No.
Respondent M.S. agreed to comply with any court-mandated orders; understands the seriousness of court intervention, agreed to supervised visits, crib-only sleeping, that I.S. must remain in crib if directed and accepts court-ordered conditions (supervised contact, crib-only sleeping, reporting duties) "Yes, I know. I would lose my children if I do not comply with the court orders" went her testimony. And " . . . do you understand that if the court allows the children to be with you today, it will require you and the children to be supervised by other adults and you accept that? "Yes, ma'am."
Throughout the presentation of Respondent M.S.'s testimony, no explanation of how six-month-old I.S. received the fractures was offered. According to the medical evidence, as alleged in the petition, the subject child's fractures are non-accidental in nature and caused by pulling or twisting of the arms with force.
At the conclusion of the hearing, and joined by the Attorney for the Children ("AFC"), Respondent's attorneys argued the evidence presented makes clear Respondent M.S. has the necessary insight to appreciate the significance of court orders and the proposed release of the subject children with a direct placement to F.K., a "move in-cousin" and other extended family and friend's agency approved resources proposed as supervisors are sufficient to ensure the safety of I.S. and the other two children should the court release the subject children under the proposed terms. Respondent Father, W.S., agreed to voluntarily vacate the small one bed-room apartment, and all the additional proposed supervisors will collectively mitigate whatever risks may exist. Put differently, family reunification is possible with multiple adult supervisors to ensure the safety of the subject children as they all agree to court-mandated sleeping arrangements, visitation, and ACS supervision. ACS will conduct announced and unannounced random weekly visits to verify compliance.
Legal Framework
Sitting in the Child Protection Part of Bronx Family Court exposes the Court to a steady diet of child neglect and abuse allegations from a cross section of the community and the court is often called upon to make quick decisions effecting families on very limited information. Generally, Article 10 of the Family Court Act provides due process of law for determining when "ACS", through the Family Court, may intervene in a family on behalf of a child to ensure the child's safety. (See, e,g., Matter of Jamie J., 30 NY3d 1014 (2017) (Wilson, J.)
Statutorily, child protection agencies can exercise emergency removals without court approval before actual harm occurs if the risk is imminent and substantial. (FCA § 1024). Imminent risk of danger must be "near or impending," not merely speculative or possible. (FCA [*4]§ 1012[h]; Nicholson v. Scopetta, 3 NY3d 357, 368-370 [2004]). 
Article 10 of the Family Court Act defines a neglected or abused child as one whose condition has been impaired or is in imminent danger of impairment due to a parent's failure to exercise a minimum degree of care. The standard is objective—what a reasonable and prudent parent would do under similar circumstances (FCA § 1012[f][i][B]; Nicholson v. Scopetta, supra.) At this early juncture of the proceedings, the court's primary function is child protection. (See, FCA § 1011).
As a matter of evidence at a FCA § 1027 hearing, only competent, material, and relevant evidence may be admitted, including "hearsay" (FCA § 1046[b][iii])) to determine the imminent risk of harm to the child.
In the absence of any evidence by Respondent to the contrary, the court is required to treat every allegation in the petition as true.[FN4]
The medical evidence alleged in the petition indicates that six-month I.S. suffered bilateral humerus fractures and a clavicle fracture showing signs of new bone growth giving an approximate age of the fracture at two weeks to a month; and the that the unexplained injuries are not the result of an accident.
Res ipsa loquitur is Latin for "the thing speaks for itself" and has evolved into an evidentiary doctrine. To apply this doctrine in an Article 10 proceeding, ACS must establish by a preponderance of the evidence that the injuries to the child: (1) would not normally occur without negligence or abuse; (2) the parents or guardian had exclusive control of the subject child; and (3) there are no apparent medical explanations for the injury. (See, Matter of Philip M. 82 NY2d 238 [1993]). Application of the res ipsa loquitur doctrine triggers a presumption of negligence or abuse. Even without direct proof, it creates a legal presumption of abuse or negligence, shifting the burden to the parent to prove they were not at fault. The doctrine is codified in FCA § 1046(a)(ii).
It is particularly useful in cases such as this one where the medical evidence establishes the injury could not have occurred by accident and the parents, with exclusive care and control of the six-month child, proffer no reasonable explanation for the injuries. (Matter of Phillip M., supra. at 243; Matter of Matthew (Kenneth O.), 103 AD3d 67 (1st Dept. 2012). 
In New York, there is a large body of cases finding abuse on very similar facts presented herein. (See, e,g., In Re Nicholas B. 8 AD3d 108 (1st Dept. 2004)(mother of child offered no reasonable explanation for child's injury); In re F Children, 271 AD2d 249 (1st Dept. 2000) (one year old had a broken wrist and two fractures in arm in separate incidents two months apart. Mother had inconsistent and contradictory explanations); Matter of Ilene M., 19 AD3d 106 (1st Dept. 2005)(9-month old twins — both have a fractured limb — medical proof indicates injuries could not have been sustained without maltreatment and mother had no credible explanation); Matter of Takia B., 73 AD3d 575 (1st Dept. 2010)(Five-month old baby had unexplained injuries - four broken ribs and a fractured clavicle).
Notably, in light of the prima facie medical evidence set forth in the verified petition and in the absence of discovery and a full fact-finding hearing, Respondent M.S. conceded the [*5]presumption of abuse at this hearing and argued only orders can be put in place to assure the safety of the subject children during the pendency of this matter with the direct placement to Fanta Reita and other family resources as proposed.
The Court credits the testimony of ACS CPS Ms. C., Respondent M.S., and proposed supervisor F.K.. The Court also gives the appropriate weight to the medical findings as set forth in the petition.
At this preliminary stage, the presumption of abuse stands. However, the law requires not only a finding of risk but an inquiry into whether that risk can be reasonably managed without continued removal. The proposed arrangement provides continuous adult supervision, ensures Respondent Father's absence from the home, and places the family under heightened ACS oversight.
Therefore, based on the particular facts of this case, this court finds continued removal is outweighed against the trauma of separation should the protective orders put in place be followed and will mitigate the risk to these children. Given these protections, continued placement would inflict substantial emotional harm on a dependent, and breastfeeding infant without a corresponding benefit to the child's safety. As such, the balance of interests favors release with conditions. (See, Matter of Caleb S., 78 Misc 3d 1215(a) (Bronx Family Ct. 2020)(Park., J.); Matter of Y(A), 85 Misc 3d 1271(A) (Bronx Family Ct. 2025)(Broderick, J.)
Accordingly, it is
ORDERED the Respondent M.S.'s Family Court Act ("FCA") § 1027 application is granted on the following conditions:
1. The subject children shall be directly placed with F.K. who shall reside at the Respondents' apartment with the subject children; and
2. Respondent M.S. shall also be permitted to reside at the same located apartment however cannot be left alone with the subject children and shall be supervised by F.K. or any additional family resource previously approved and "cleared" by ACS; and
3. Respondent W.S. shall be excluded from sleeping in the apartment, but shall enjoy free agency approved resource supervised visits with the subject children; and
4. Additional proposed family resource supervisors shall be presented to ACS and shall be "cleared" before enlisted to serve and shall be bound by this order and directive; and
5. Respondents shall cooperate with ACS supervision including announced or unannounced home visits; and
6. Respondents shall comply with all ACS recommended preventive services including any reasonable referrals in writing and provide a copy to all counsel; and
7. Respondents are to comply with a Limited Order of Protection by not removing the subject children or be alone with the subject children without resource approved supervision; and
8. Respondents ensure the subject children attend all doctor appointments and follow all service recommendations; and
9. A copy of the underlying neglect petition and this order shall be provided to all services providers; and
10. The Respondents shall sign all necessary releases to ensure compliance with service providers; and
11. It is further ordered that ACS shall take any protective measure necessary to ensure [*6]the protection of the subject children and prevent any violations of this order; and
12. ACS shall ensure the apartment is equipped with a "crib" and mattress for the subject child, I.S., and Respondent M.S. is directed not to sleep with the subject child; and
13. The parties shall email the court's court attorney, Marisol Durán, Esq., at [email protected], to schedule a preliminary conference in late January 2026 and fact-finding in May 2026. Discovery shall be provided as soon as available to ensure a speedy trial on the merits.
This constitutes the decision and order of the court.
Dated: November 28, 2025
Bronx, N.Y.
HON. ANGEL CRUZ, A.J.F.C.

Footnotes

Footnote 1:In circumstances of imminent danger to a child, the Family Court Act authorizes the child protective agency or the police to remove the child for the home with or without a court order, even before a petition is filed.

Footnote 2:At the FAC § 1027 hearing, ACS entered the verified petition alleging abuse in evidence without objection, as Petitioner's #1.

Footnote 3:Respondent's Attorneys entered Exhibit #A — A letter from BronxCare Health Systems employee and childhood friend, dated November 24, 2025, and Exhibit #B a copy of an email from Pre-school teacher into evidence without objection.

Footnote 4:Given the of the emergency nature of the removal and driven by New York's strong public policy of protecting the health and safety of children, the court must construe the allegations in the verified petition in the light most favorable to the presenting agency measured by a fair preponderance of the evidence. (See, FCA § 1027, 1031 and 1046[b]).